GEORGE WASHINGTON PHARES v. CENTURY ELECTRIC COMPANY, a Corporation, Appellant.—82 S. W. (2d) 91.

Division One, April 17, 1935.

*Wayne Ely, Tom Ely, Jr.,* and *S. P. McChesney* for appellant.

John B. Dale and Mason & Flynn for respondent.

HYDE, C.—This is an action for personal injuries, alleged to have been caused by an electric shock. Plaintiff claimed to have been shocked while carrying out an order of his foreman to put an electrode in an electric furnace without turning off the power in the furnace next to it. Plaintiff obtained a verdict for $9,500, and from the judgment entered thereon, defendant has appealed.

Plaintiff's evidence was that he was injured, September, 1926, while working as a furnace tender in defendant's foundry. He had commenced work there in January, 1925, and worked about a year as a moulder's helper. He was then made a furnace tender and worked about three months on the night shift under Foreman Arthur Althaus. He then worked on the day shift for about six months before he was injured. His foreman at the time he was injured was Jack Pippen. Plaintiff tended three electric furnaces, designated as No. 1, No. 2 and No. 3. These furnaces were placed end to end about five feet part. No. 1 was on the west side, No. 3 on the east side and No. 2 in the center. The furnaces were round like a barrel, about four and one-half feet long, and rested on a frame above the floor. They were used for melting metal. It took from thirty to forty minutes to melt bronze and from forty-five to sixty minutes to melt brass. Metal was brought in a wheelbarrow and shoveled in a door in the center of the furnace. When melted it was poured out by turning the furnace over by means of a crank. To make the heat necessary to melt the metal, carbon electrodes, two and a half inches in diameter and about three feet long, where put in each end of the furnace and an electric current run through them. The arc of the electricity between the ends of the electrodes in the center of the furnace created the heat. This current was turned on by a wall switch. When the metal began to melt, the furnaces were caused to rock by a motor, started by moving a lever. The rocking was to prevent the moulten metal from sticking to the sides of the furnace. The ends of the electrodes gradually burned off and they were pushed farther into the furnace by turning a wheel. There was housing, with a water jacket, around the electrodes to keep them from burning too fast. When the electrodes were first put in they stuck out of the end of the housing eighteen to twenty inches.

It was usually necessary to put one new electrode in each furnace every day. Plaintiff was expected to watch them and put in new ones as they were needed. When he put in a new electrode, he would turn off the furnace, which required the new electrode, and also the one next to it, at the end where he would be working. He had been instructed to always do this when he began tending the furnaces. Foreman (Althaus), under whom he first worked, said: "When they were working on the furnace next to the one in operation, I had them shut off the power. . . . I told him not to make any repairs or put in an electrode until it was shut off on the wall. . . . That was the duty of the furnace tender." Plaintiff testified that it was his duty to turn off the furnaces "when the foreman wasn't around;" that when his foreman was present, he asked him about turning them off; and that he thought he had asked Foreman Pippen about it on other previous occasions. Plaintiff said: "It was my duty when the foreman wasn't around. . . . When he was present and had any occasion to shut the power off I would tell Mr.

Pippen. He was the foreman and I had orders to do as my foreman told me." In a deposition, plaintiff had testified that "on every occasion except this one" he had gone ahead and turned it off himself. However, he said: "On this occasion I was hot, you know, and all sweaty, and it looked to me like this carbon, as well as I could see, in No. 3 stuck out farther than usual when we connected a new carbon; but I always shut it down anyway, but by him being present, standing there, my hepler busy getting out metal, he come to help me. When my helper was busy he would come and help me. When I was working on one of the furnaces he was watching the power. . . . Him being the foreman, I thought I would ask his permission."

About two P. M. on the day plaintiff was injured, he had put a new carbon in the west end of furnace No. 3. He then operated this furnace long enough to melt the metal in it and had it rocking, when he found the electrode burned off in No. 2. He shut it down to put in a new electrode. Furnace No. 1 was also burnt out at this time. Plaintiff said his foreman was present and he asked him: "Jack, don't you think we had better shut the power off No. 3 while putting the electrode in No. 2?" But that Foreman Pippen said: "Hell, no; we haven't got time; we already got two furnaces down, and I will watch you; go ahead." Plaintiff said that he then attempted to put the electrode in furnace No. 2 with furnace No. 3 rocking; that to do so would bring the end of the electrode sticking out from No. 3 so close to the end of the one he was putting into No. 2 that they would be practically together, "not over six inches apart;" that, while putting in the new electrode he was facing south with his right hand under the electrode and his left hand over it so that his left arm and shoulder would be nearest to furnace No. 3; and that while he was in that position, the ends of the electrodes came together so that he got a shock, which he said knocked him to the floor unconscious and broke the electrode he was holding into three pieces.

Foreman Pippen did not testify, but it was shown that he had left the employ of the company. Plaintiff said he received medical attention from the company's doctor the same afternoon after the accident. Defendant's evidence was that he did not go to this doctor until the day following the injury, when a report of the accident was signed by plaintiff which contained the following statement: "No. One furnace burnt out and No. Three was started . . . the power in No. Three was on and off in No. Two—while screwing the carbon (electrode) on another piece in No. Two, the carbon struck or touched the carbon on No. Three, giving me a shock." Defendant contended that the current going into the electrodes was not dangerous; that it was a low tension current of only 90 volts; and that no one had ever been hurt by it. Defendant's electrical maintenance man testified that the current ordinarily used for lighting residences and business buildings was 110 to 115 volts and that the amperage

was about the same. He made a demonstration of the harmlessness of such a current by cutting the wires in the courtroom, while the case was being tried, and holding them so that the current passed through his body to light the courtroom lamps. It was brought out in his testimony that the current going into the electrodes came through transformers from wires carrying a current of 230 volts and that this 230-volt current ran directly into the motors used to rock the furnaces. Foreman Althaus, who testified as a witness for plaintiff, said that there was an occasional shortage at the furnaces from which he got a shock once in a while, but that he never got one that knocked him down. He said that "if you touched it (the electrode) you would get a shock;" that "it will kind of touch you up;" that he had "touched them by accident but not on purpose;" and that he never got hurt. Defendant had considerable medical evidence tending to show that plaintiff was not really hurt.

█ Defendant contends that its demurrer to the evidence, at the close of the whole case, should have been sustained because plaintiff's evidence showed that his place of work was not unsafe, except by reason of his own failure to shut off furnace No. 3, and that he was guilty of contributory negligence as a matter of law in working on No. 2 without shutting off No. 3 Defendant's contention, however, means that plaintiff should have either shut off No. 3 without asking his foreman about it; or that he should have shut it off, after he did ask him, in violation of his order; or that he should have refused to put in the electrode under these conditions. We will not hold that plaintiff has shown himself guilty of contributory negligence as a matter of law by not choosing one of these three alternatives. Nor will we say, under the circumstances disclosed, that there was no negligence for which plaintiff's employer could be liable. There was no showing that plaintiff had ever been shocked or seen anyone shocked or that he knew the strength of the current used. It does not seem so unusual, as to be unbelievable, that a workman would explain his situation to his foreman who was present or who came upon the scene. According to plaintiff's testimony, this situation was that, of his three furnaces, No. 1 was burnt out, whether out temporarily or for the rest of the afternoon is not clear; that No. 3 had been going long enough to melt the metal in it and was rocking, therefore about to complete the preparation of the metal for which it had been started; and that No. 2 could not be operated until a new electrode was put in, whether or not there was metal in it at the time was not shown. Neither is it shown what the effect on the moulten metal in No. 3 would be, if it was turned off. We, of course, know that it would cool some, when the heat was turned off, and that this would delay, to some extent, the final preparation of the metal in it. It would seem to be a reasonable inference that plaintiff was in doubt whether to delay operations by turning it

off while he put the electrode in No. 2, or delay operations by waiting to so charge No. 2 until the metal was completely melted and poured out of No. 3. That may have been the reason he asked the foreman what to do, but whether it was or not, we think that it was for the jury to decide, under these circumstances, whether asking directions from the foreman was a reasonable thing for plaintiff to do.

Plaintiff says he did ask him and if he did (which the jury had a right to believe) then these questions arise: Did the foreman give a negligent order? And, if so, was it an order to do something so obviously and glaringly dangerous that a reasonably prudent man would not undertake it? ·[Macklin v. Fogel Construction Co., 326 Mo. 38, 31 S. W. (2d) 14; Sloan v. Polar Wave Ice & Fuel Co., 323 Mo. 363, 19 S. W. (2d) 476; Ingram v. Prairie Block Coal Co., 319 Mo. 644, 5 S. W. (2d) 413, and cases cited; Lawhon v. St. Joseph Veterinary Laboratories (Mo.), 252 S. W. 44; Jewell v. Kansas City Bolt & Nut Co., 231 Mo. 176, 132 S. W. 703.] Upon the authority of these cases, we hold that these were questions for the jury in this case. In passing upon them, the jury had the right to consider that electricity is a highly dangerous invisible force; that the employer who uses it is under the duty of exercising the highest degree of care to make its use safe (Foster v. K. C. C. & St. J. Ry. Co., 325 Mo. 18, 26 S. W. (2d) 770, and cases cited); that he, and those who direct the work for him, are in a better position, than his workmen, to know and should know the kind, condition and safety of appliances and equipment through which it is used; that an employee is justified in relying, to a reasonable extent, upon his employer's superior knowledge; and, also, that in this case the defendant's evidence was to the effect that the ordinary current passing into the electrodes was not harmful. The jury could reasonably believe, if they believed plaintiff's testimony as to his injuries, either that there was on that occasion more current than usual in the electrodes of furnace No. 3, or that defendant's evidence, that the usual current was harmless, was untrue. In either case, it would have been negligence for the foreman in charge to order an employee into a place where the foreman knew or by the exercise of proper care could have known, that there was current which would be likely to injure him, and in neither case does it conclusively appear that this was so obvious to plaintiff that he would be guilty of contributory negligence as a matter of law in obeying the order. We hold that defendant's demurrer to the evidence was correctly overruled.

Defendant further assigns as error the action of the court in giving plaintiff's Instruction No. 7, which is as follows:

"The jury are instructed that the opinions of the witnesses as experts *are merely advisory and not binding on the jury;* and the jury should accord to them such weight as they believe from all the facts and circumstances in evidence, the same are entitled to receive."

There can be no doubt that it is error to give this instruction. Plaintiff says that this exact instruction has been approved by this court in earlier cases. [Copeland v. Wabash Ry. Co., 175 Mo. 650, l. c. 662, 75 S. W. 106; Markey v. L. & M. Railroad Co., 185 Mo. 348, l. c. 364, 84 S. W. 61.] These cases were, however, overruled by this court in Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84, which is the latest opinion of this court en banc on the subject. Of course, no testimony is binding (conclusive) on the jury unless it is admitted so that its truth is not controverted. The vice of this instruction, for which it is denounced in the Scanlon case, is that "it singles out for comment the opinion testimony of expert witnesses" and classifies it as something which is not to be treated as evidence. An opinion of an expert is his inference from facts. Many things related by lay witnesses "which we chose to call 'fact' is or may be only 'opinion' or inference . . . all matters of measure, identity, quality and the like must be considered as no better than opinions." [4 Wigmore on Evidence, 112-114, sec. 1919.] "The fact that a witness possessing the necessary skill would draw a certain inference from the facts possesses such probative force as justifies its reception as some evidence that such inference is the correct one. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, and cases cited, l. c. 957.] The only reason any testimony as to facts is admitted is that it is some evidence of the correctness of the facts stated.

As this court stated in the Scanlon case:

"An opinion, when not a mere guess conjecture but an inference drawn by one of requisite experiential capacity from adequate data, *is evidence*. . . . An inference drawn from given data by a person who is peculiarly qualified to do so by reason of his experience or special skill or learning is no less a fact. There is therefore no logical distinction between opinion testimony in the sense here used and so-called fact testimony. [4 Wigmore on Evidence (2 Ed.), pp. 100-125, inclusive.] The values of both are measured by precisely the same standards."

It is wholly wrong to say that such testimony is merely advisory. It is no more advisory than any other competent testimony. The opinion of a medical expert based upon examination and treatment is substantial evidence and its weight is for the jury. [Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561, l. c. 564; O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; Spencer v. Q., O. & K. C. Railroad Co., 317 Mo. 492, 297 S. W. 353; Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84; Cropper v. Titanium Pigment Co. (C. C. A.), 47 Fed. (2d) 1038, 78 A. L. R. 737; note, 78 A. L. R. 755; 22 C. J. 639, sec. 733, p. 728, sec. 823; 11 R. C. L. 574, sec. 7, p. 584, sec. 14, p. 586, sec. 16; 1 Wigmore on Evidence, 1081, sec. 673; 4 Wigmore, 115, 116, secs. 1920, 1921.] The

statement that expert testimony is advisory is a remnant of an erroneous and now discarded theory about expert testimony which this court en banc broke away from in O'Leary v. Scullin Steel Company, supra. For pertinent statements about the earlier Missouri cases see 4 Wigmore on Evidence, 203, note. An early protest against this kind of an instruction which is in line with the decision of this court en banc in the Scanlon case is found in Hoyberg v. Henske, 153 Mo. 63, l. c. 78, 55 S. W. 83. Wigmore points out that expert testimony "in its original and long persisting form . . . was hardly regarded as evidence to the jury, but as an aid to the court." Thus, at first, it was purely advisory. A complete and enlightening discussion of the history of expert testimony and the opinion rule and erroneous theories about it which have in the past misled bench and bar will be found in 4 Wigmore, 100, secs. 1917 to 1929.

It is argued in plaintiff's brief that: "With evidence of this character before them, unless the jury are cautioned and told what their functions are, the natural tendency of the jury would be to abdicate their functions and consider themselves bound by the opinions of these experts and, without undertaking themselves to consider the facts shown in evidence, apply these various opinions to the facts and reach their own conclusions."

A complete answer to this argument is found in 1 Wigmore, 1081, section 673, as follows:

"The expert is not trying to usurp that function, and could not if he would. He is not trying to usurp it, because his error, if any, is merely the common one of witnesses, that of presenting as knowledge what is really not knowledge. And he could not usurp it if he would, because the jury may still reject his testimony and accept his opponent's, and no legal power, not even the judge's order, can compel them to accept the witness's statement against their will. That there is no hidden danger to the jury system, and no need of invoking rhetoric in its aid, will be seen when it is remembered that the logical necessity for hypothetical questions is exactly the same for a judge sitting without a jury. Whatever the tribunal, it must separate premises from conclusions, and it must wait till the end of the trial and all the evidence on both sides is in, before it determines what premises are proved and therefore which opinions have a factual basis."

Plaintiff cites Kunkel v. Griffith, 325 Mo. 392, 29 S. W. (2d) 64, where this same instruction was held not prejudicial. This does not help plaintiff here, for several reasons.

First: The Kunkel case was handed down in Division One before the pronouncement of the court en banc in the Scanlon case and the Scanlon case is controlling.

Second: The Scanlon case recognizes that there might be circumstances under which such an instruction, although error, would

not be prejudicial error. We think that was true of the Kunkel case and we think that was what the court meant in holding that in that case it could not have been prejudicial. This was true because the opinions of the experts in the Kunkel case were merely cumulative evidence. Their opinions were to the effect that a certain thing occurred (land formed as an accretion to the shore land and not as an island) exactly as many eyewitnesses testified they observed it. Ordinarily, it is not prejudicial error to refuse entirely the admission of otherwise competent testimony when it is merely cumulative. [Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617, 1. c. 624.] Therefore, it might not be prejudicial in a particular case to strike out such cumulative evidence by an instruction. If it would not be prejudicial to eliminate it entirely, it would certainly not be to do something less than that.

Third: The instruction, in this case, could not have been otherwise than highly prejudicial for the same reasons that it was in the Scanlon case, because the really contested issue in this case was not whether plaintiff received some electrical shock but whether the shock was severe enough to cause any injury and whether at the time of the trial plaintiff was suffering any effects of it, and practically the only evidence defendant had was the testimony of its medical and electrical experts. Plaintiff had his own testimony and the testimony of a doctor who had first examined him two and one-half years after the accident. However, his doctor's testimony showed very little in the way of objective symptoms (he said as to the muscles of plaintiff's left arm and shoulder: "I couldn't swear they were atrophied, but I got that impression they were smaller and softer"); and whose evidence amounted to little more than that he thought it was possible that an electric shock could have caused certain tenderness and lack of feeling which he stated that he found in his examination. Defendant, on the other hand, in addition to its electrical experts' testimony that the current was harmless, had the testimony of the doctor and nurse, who treated plaintiff the day after his shock and who said that there was no evidence of an injury at that time; and also the evidence of two other doctors, who examined plaintiff prior to the trial very thoroughly by X-ray and other methods and who testified that they could find no evidence of any injury which could have resulted from an electrical shock. Their evidence was further to the effect that such an examination as they made would reveal some destruction of nerves or tissues if there had been sufficient shock to cause the ill effects which plaintiff claimed resulted therefrom.

The prejudicial effect of this instruction, in this case, is well demonstrated by the following argument made in plaintiff's brief:

"A case like the one at bar is a good illustration of the necessity of giving such an instruction as the one criticized here. Dr. Am-

brose, the defendant's medical expert, disclosed in his qualifications that he had not only had the best training that the United States could afford, but had studied in London and Vienna at the greatest universities in the world, and then was in charge of base hospitals during the war; and the defendant had two other doctors, one at least of whom qualified very strongly as to his ability, whereas the plaintiff had one doctor. . . . Dr. Ambrose discloses profound knowledge of the subject and gives evidence which could not be given except by a real expert on the subject. At the same time, he expresses it so simply that a child could understand what his facts are and what the conclusion is that he draws from those facts. . . . The natural inclination would be to say, here are three medical men on one side, one of whom at least possesses extraordinary qualifications, experience and training, while on the other side there was just one doctor who seems to have been to school enough to authorize him to practice and that was about all, so the opinions on the defendant's side settle the matter."

Plaintiff's counsel were entitled to argue to the jury the weight and credibility of the testimony of these doctors as compared with their own but, because it was strongly backed by authority and learning, well stated, and easily understood, they were not entitled to have the court help them weaken the consideration to be given it by the jury by giving an instruction stating that it was merely advisory and not binding on them. [See also Davis v. City of Independence (Mo.), 49 S. W. (2d) 95; Conduitt v. Trenton Gas & Electric Co. (Mo.), 31 S. W. (2d) 21; 64 C. J. 579, sec. 511.] The prejudicial effect of this instruction undoubtedly reflected in the verdict in this case, which was within $500 of the maximum amount ordinarily permitted by this court to stand in cases where a plaintiff has lost an arm or leg by amputation (see Jenkins v. Mo. State Life Ins. Co., 334 Mo. 941, 69 S. W. (2d) 666, and cases cited); when this plaintiff, by his own testimony, went back, on the day of his injury, and finished his afternoon's work, continued to work in defendant's plant for eight or nine months thereafter, worked in another factory, planted and raised a crop of corn, and worked all one winter as a farm hand, feeding livestock, milking cows, cutting, loading, hauling and unloading wood and doing other usual farm chores; and when there was no showing of reasonable certainty that he had a permanent injury.

Since the case must be retried we suggest that Instruction No. 1 should be redrawn to meet the criticisms made by defendant. We do not think that it assumes facts but it could be made clearer that it did not do so by using such phrases as "if you so find" and "if any." It would also make the instruction clearer to use the words "to put an electrode on" rather than the words "to work on." It is always safer to make an instruction more specific than the allegations of the pleadings, rather than to make it more general. The

evidence usually narrows the issues to be submitted and a more specific statement of the requisite facts usually makes these issues clearer to the jury. The object of instructions should be to make the issues as clear as language can make them. We further suggest that the negligence charged against defendant is not technically correctly described as a failure to furnish plaintiff a reasonably safe place in which to work, but is really the giving of a negligent order to do a specific thing in an unsafe manner. [See Schaum v. Southwestern Bell Tel. Co., 336 Mo. 228, 78 S. W. (2d) 439.] The place was not unsafe for this work to be done with both furnaces turned off.

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.