Shirley **HELTON** et al., Respondents,

v.

Ben **HAKE** et al., Appellants.

Nos. KCD 28896, KCD 28897.

Missouri Court of Appeals,
Kansas City District.

Feb. 27, 1978.

Motion for Rehearing and/or Transfer
Denied April 3, 1978.

Application to Transfer Denied
May 9, 1978.

Barry J. Levine, Lewis E. Mallott, St. Louis, for appellants.

Henry P. Andrae, Jefferson City, for respondents.

Before SHANGLER, P. J., WASSERSTROM, J., and MASON, Special Judge.

WASSERSTROM, Judge.

Suit for wrongful death of Norman Helton brought by his widow and children against International Association of Bridge, Structural and Ornamental Iron Workers, A.F. of L.–C.I.O., Local No. 396 and the Union steward Ben Hake. From a judgment on a jury verdict for plaintiffs, both sides appeal. We affirm.

On September 11, 1973, Helton was working as an iron worker for Maggi Construction Company in the construction of a metal building in Salem, Missouri. A high tension power line ran along side the building under construction and came within 7½ feet of the point where Helton was working.

The work in progress at the time of Helton's death consisted of the attachment of angle irons to the building. The angle irons were about 20 feet long and were raised hand over hand for positioning onto a channel girder. Helton was working directly with Perry McCormack bolting up the angle iron to the girders. No one actually witnessed how Helton came to fall from the building, but a loud crack of electricity was heard, and immediately thereafter Helton was seen falling in the air from the place where he had been working. Apparently an angle iron which he was handling came into contact with the power line, causing his electrocution. He was taken to a hospital, but never regained consciousness. His death was diagnosed by the attending doctors as cardiac arrest caused by electric shock.

Mrs. Helton testified that Helton had told her the morning of his death that he had asked for the power in the high tension line to be turned off and that he was going to ask again. A co-worker further testified that preceding the accident Helton talked about the power line being close to the place of work and that the line should be covered; this statement took place in the presence and hearing of a number of the crew, of whom Hake was one and of whom the foreman Loethen was another.

At the time of the fatal accident, the Union had a collective bargaining agreement in effect which had been signed on behalf of Associated General Contractors of St. Louis, Erectors and Riggers Association, and Site Improvement Association. Article 7 of that Agreement is entitled "Working Rules" and contains as a sub-part "Safety Provisions." Part of that subdivision provides:

"Section 7.28 *Power Lines, High Tension*: There shall be no work done in the immediate area of high tension lines until the power has been shut off, or the lines insulated, or the safety of the members of bargaining unit otherwise provided for."

Section 7.20 of that same article provides that the Union steward "shall see that the provisions of these working rules are complied with and report to the Union the true conditions and facts. He shall report the injury of any employees to the proper officers of the Union." This same section goes on to provide "that the Employer is in no way responsible for the performance of these functions by the steward."

Plaintiffs premise their law suit on the theory that the provisions of the collective bargaining agreement quoted created a duty on the Union steward Hake and through him upon the Union to safeguard the employees, including Helton, from the power line adjacent to the work place and that their failure to perform that duty constituted a tort for which recovery can be had under the wrongful death statute. The verdict directing instructions adopted that theory and instructed the jury to find for the plaintiff if (among other things) Maggi and the Union were operating under the terms and conditions of the collective bargaining agreement, if Hake had a duty to enforce and failed to enforce the provision of Section 7.28 of the contract, and if Hake was thereby negligent. The trial court, although requested to do so by plaintiffs, refused to submit to the jury any issue relating to assessment of punitive damages against defendants in connection with damage to Helton's gloves and boots.

For their points on appeal, defendants assert: 1) that there was no proof that there was any agreement in force with respect to the Maggi construction project; 2) that the Union's obligation was limited to that of "fair representation" and that it was not liable to Helton nor is it liable to his survivors for mere negligence; 3) that Helton was guilty of contributory negligence; 4) that plaintiffs did not comply with the requirements for a class action as provided by statute and court rule; and 5) that the trial court improperly limited the testimony of Hake. Plaintiffs for their part assign as error the refusal of the trial court to submit the issue of punitive damages.

I.

Under the court's instructions, in order to find for plaintiffs, the jury had to find that Maggi and the Union were operating under the terms and conditions of the agreement in evidence and which has been quoted above. That agreement by its terms was entered into with the Union on behalf of three employer associations. According to the evidence, Maggi was not a member of any of those three associations nor had it signed individually, nor was there any evidence that it had expressly agreed to be bound by that contract. Because of this state of proof, defendants insist that plaintiffs failed to prove an essential element of their case and a verdict should have been directed for defendants.

There was however substantial evidence from which it could be reasonably inferred that Maggi and the Union had agreed at least by implication to operate under the terms of the collective bargaining agreement. Thus the evidence shows that the Maggi foreman employed all of the workmen on this job, including Helton, through the Union field steward, Leon Henderson. The testimony was that Maggi could not hire any workmen "without the union's O.K."

Still further, the Union did appoint Hake steward on the job in compliance with the provisions of Section 7.20 of the contract.

Hake in his testimony acknowledged that as steward he had the job of enforcing the working rules as set forth in the contract. Hake answered affirmatively to the proposition that these provisions constituted "the working rules by which you ply your trade" and that the contract was his "Bible." Worthy of special note is the fact that in recognition of his duties under the contract, Hake filed a Steward's Weekly Report, reporting on the accident which had resulted in Helton's death, showing that five workmen, all members of the Union in good standing, were on the job and that Helton had suffered death from electrocution on September 11, 1973.

■ Moreover and conclusive against defendants on this point, they have pleaded and affirmatively relied upon as a defense a collective bargaining contract covering the Maggi job. Thus the second affirmative defense of their answer alleges that "[d]efendant Iron Workers Local 396 is limited by the provisions of the collective bargaining agreement, referred to in Plaintiffs' Petition * * *," and their third affirmative defense alleges that "[d]efendant Iron Workers Local 396 is not liable to Plaintiffs for the death of decedent by reason of its alleged negligence, if any there be, in enforcing its collective bargaining agreement with the employer of decedent * * *." Where, as here, a defendant pleads a fact, it may not mount an argument directly contrary thereto. *Hall v. Brookshire*, 364 Mo. 774, 267 S.W.2d 627, 630[4] (banc 1954); 31 C.J.S. Estoppel Sec. 117 b., p. 623, and Sec. 118 b., p. 631.

## II.

In denying that they can be liable to plaintiffs in tort, defendants make a twofold argument. They say: A. That "Plaintiffs may not bring a tort action against Defendants for violation of the collective bargaining agreement;" and B. That even if state law permits such a tort action, application of that state law would subvert the national labor policy under which a union's liability is limited to providing fair representation as collective bargaining agent.

## A.

■ Contrary to defendants' contention, the Missouri cases hold that liability in negligence may grow out of the breach of a duty imposed by a contract. *Helm v. Inter-Insurance Exchange*, 354 Mo. 935, 192 S.W.2d 417 (banc 1946); *Braun v. Riel*, 40 S.W.2d 621 (Mo.1931); *Ellyson v. Missouri Light & Power Co.*, 59 S.W.2d 714 (Mo.App. 1933); *Peitzman v. City of Illmo*, 141 F.2d 956 (8th Cir. 1944); *Aetna Insurance Co. v. Hellmuth, Obata & Kassabaum, Inc.*, 392 F.2d 472 (8th Cir. 1968). So it was said in the *Braun* case, *supra*, at l.c. 623:

> "It is well settled that, while a 'tort' is a wrong done independent of contract, there are torts committed in the nonobservance of contract duties. And if a tort arising out of nonobservance of such duties results in a death, a surviving person entitled to sue may avail himself of the Wrongful Death Statute."

■ This point has been reviewed in this very case by Judge Hunter in *Helton v. Hake*, 386 F.Supp. 1027 (D.C.Mo.1974). After the filing of this suit in the circuit court, defendants filed a petition for removal to the United States District Court alleging federal jurisdiction under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. Sec. 185(a). That section authorizes suits in the federal District Court for violation of a collective bargaining agreement without respect to the amount in controversy or the citizenship of the parties. Defendants' theory on the removal proceeding, as it is here, was that plaintiffs' cause of action arose out of and was for the purpose of enforcing the safety provisions of the collective bargaining agreement. Plaintiffs filed a motion to remand, denying that their cause of action was on the contract and insisting instead that their cause of action was in tort. Judge Hunter (a former member of this court) ruled in favor of the plaintiffs and remanded the case to the state circuit court, stating in part as follows at l.c. 1031:

> "In the instant case, taking the allegations contained in the complaint as true,

the contract did impose upon the defendant union an affirmative duty to enforce safety rules. The complaint alleges that the union, through its agent, the steward, negligently and carelessly failed to enforce the safety rule relating to work in the area of high tension power lines. The suit is clearly brought as an action in tort seeking recovery for wrongful death due to the alleged negligence of the defendants. The only relevance of the collective bargaining agreement appears to be that it would determine, to some extent at least, the nature and scope of defendants' duty. That defendants' duty may have arisen under a contract does not in and of itself change the basic nature of this action, which is a suit in tort to recover damages for injuries sustained due to defendants' alleged negligence. Compare *Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc.,* 392 F.2d 472 (8th Cir. 1968)."

Judge Hunter, thoroughly conversant as a lawyer and judge with Missouri law, has held that the facts of this case confer upon plaintiffs a cause of action for negligence. We concur and adopt that opinion.

### B.

The discussion now comes to defendants' principal argument and what is by all odds the most substantial point in this case. Defendants argue that even if plaintiffs have a cause of action for negligence under Missouri law, such state law may not be applied because of alleged conflict with an overriding federal labor law policy to the contrary.

■ As defendants correctly say, the extent to which federal labor law takes hold and preempts state law was formulated and is still expressed by *Amalgamated Association of Street, Electric Railway and Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). In that case, the plaintiff employee had been discharged at the instance of his union because of his failure to pay dues to the union on time. The plaintiff alleged that the discharge violated the union rules and the provisions of the collective bargaining

contract, and he brought suit against the union for damages in the state court. The United States Supreme Court held that state court jurisdiction had been preempted by the National Labor Relations Act saying in this respect that: "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by Section 7 of the National Labor Relations Act, or constitute an unfair labor practice under Section 8, due regard for the federal enactment requires that state jurisdiction must yield."

The plaintiff employee then sought an exemption from that preemption rule under the principle that Section 301 deliberately chose to give federal and state courts concurrent jurisdiction over violation of collective bargaining contracts, unaffected by the general jurisdiction of the National Labor Relations Board over labor matters. Answering that contention, the Supreme Court stated that in order to come under the Section 301 exception, there must be some arbitrary or bad faith conduct by the Union in breach of its duty of fair representation.

■ Defendants' effort to bring themselves within the *Lockridge* principle fails for the reason that this case need not and does not depend upon Section 301 in order to escape federal preemption. The failure of the Union steward Hake to enforce the safety provisions of the collective bargaining contract is in no way protected by Section 7 of the National Labor Relations Act nor could it constitute an unfair labor practice under Section 8 of that Act. See *Farmer v. United Broth. of C. & J. of America, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). Plaintiffs therefore needed not attempt to bring themselves under Section 301, and they have made no effort to do so. This point was specifically ruled by Judge Hunter in *Helton v. Hake, supra,* at l.c. 1033 as follows:

"The central issue raised by the complaint does not concern any wrongful act or failure to act on the part of the employer, but is based totally upon a negli-

gent act or failure to act on behalf of the union, arising out of a duty owed to the employee by a specific union promise contained in the collective bargaining agreement. As previously stated, no claim for a breach of the duty of fair representation is made by the plaintiffs.[5]

"It is this Court's conclusion, in view of all of the foregoing that the complaint herein cannot properly be considered a suit for violation of a contract within the meaning of Section 301(a). Rather, this is a suit predicated upon negligence, seeking damages for the alleged wrongful death of plaintiffs' deceased. Merely because some interpretation of the contract appears to be necessary to the determination of the nature, scope or extent of the duty owed does not, in and of itself, categorize this cause as an action for violation of the contract so as to grant jurisdiction to this Court under Section 301(a). To adopt defendant's view in this case would lead to the inescapable conclusion that any case in which interpretation of a collective bargaining agreement may be involved vests jurisdiction in the federal district courts under Section 301(a), regardless of the actionable wrong complained of or the relief sought, or how directly or indirectly related the collective bargaining agreement is to the action. * * * Plaintiffs herein are not praying for reinstatement or back wages, or for an improvement in working conditions. They are not employees or union members, but rather survivors bringing suit under the Missouri wrongful death law. Defendants have not suggested and it does not appear that any overriding federal labor policy is present that would warrant a construction of Section 301 to grant jurisdiction to this Court in this case."

Footnote 5 to the foregoing text reads as follows:

"5. Defendants, in their separately filed motion to dismiss the complaint, contend that this complaint is really only a suit for denial of fair representation, and that as such, it fails to state a claim upon which relief could be granted because it alleges only negligent conduct on the part of the union defendants. Defendants further argue that a suit for denial of fair representation is the only method by which the union's actions can be challenged. Were this Court to adopt this rationale, it would lead to the inevitable result that a union's negligent performance or negligent failure to perform a duty owed to an employee which resulted in that employee being injured would not be actionable in any way."

Notwithstanding that well reasoned opinion, defendants take sharp issue with it and claim it to be opposed to two other Federal opinions, *Bryant v. International Union U. M. W. of America,* 467 F.2d 1 (6th Cir. 1972) and *House v. Mine Safety Appliances Co.,* 417 F.Supp. 939 (D.C.Idaho 1976). Each of those cases is distinguishable.

In *Bryant,* the representatives of the estates of eight dead miners brought actions in the federal District Court against the union on the ground that the union had breached its obligation under the collective bargaining agreement to enforce a safety program incorporated in the collective bargaining agreement. The provision directly in question was paragraph (e) which called for the creation of a mine safety committee to be selected by the local union. That section of the agreement went on to provide in part that, "[t]he mine safety committee may inspect any mine development or equipment used in producing coal. If the committee believes conditions found endanger the life and bodies of the mine workers, it shall report its finding and recommendations to the management * * *." The court held that the quoted provision did not impose an enforceable contractual duty upon the union:

"There can be no doubt that subsection (e) does provide for a union role in dealing with safety at the mine. It indicates that a mine safety committee shall be established at each mine with members selected from among the ranks of the union local representing a particular facility. Such committee was established and functioning at the River Queen Mine.

The subsection also provides that among other powers the committee 'may inspect any mine development or equipment . . . .' It is apparently contended that this language places a duty to inspect upon the local and International Unions. We do not accept this contention. The use of the permissive 'may' rather than obligatory language in the clause clearly negatives the possibility that any duty was to be created. No liability can be predicated upon the language of subsection (e)."

*Bryant* is different from the present case in two important regards. First, the plaintiffs in *Bryant* pleaded and sought to recover for breach of contract by the union. In contrast, the plaintiffs in the instant case seek to enforce a tort duty. Secondly, the union in *Bryant* did not undertake any firm duty. In contrast, the Union in the present case did firmly obligate itself by agreeing that the Union steward "shall see that the provisions of these working rules are complied with."

*House* also differs from the case at bar. In *House,* certain employees filed suit against their employers arising out of a mine fire. The employers then filed third party complaints against the union asserting a right of indemnification and contribution, derived from an alleged right of the union members to sue the union for negligent performance of its duty to enforce mine safety. The provision in the collective bargaining agreement in question provided for a safety committee consisting of three employees designated by the union and three management members. The agreement went on to provide that, "[t]he function of the safety committee shall be to *advise with* the Plant Manager concerning safety and health matters *but not to handle grievances.* * * * Advices of the safety committee, together with supporting suggestions, recommendations and reasons shall be submitted to the Plant Manager for his Company's responsibility to provide for the safety and health of its employees * * *." (Emphasis by Judge Anderson in the *House* opinion). The collective bargaining agreement also provided that any questions concerning safety should be subject to the regular grievance procedures.

Judge Anderson held in the *House* opinion that "[i]n light of the collective bargaining agreement in this case" a theory of common-law negligence is inextricably intertwined and embodied in the union's duty of fair representation; that the duty of fair representation is governed by federal law; and that federal law dictates that the exclusive duty owed by the union is that of fair representation and negligence on the part of the union is insufficient to impose any liability.

■ Although Judge Anderson intimated that his opinion in *House* was at variance to that of Judge Hunter in *Helton,* the opposition between Judges Anderson and Hunter is more apparent than real. As specifically stated by Judge Anderson, the *House* opinion was rendered in light of the particular collective bargaining agreement involved in that case. That agreement imposed no responsibility upon the union other than in an advisory capacity and in the handling by normal procedure of grievances which might arise out of safety complaints. In contrast, the Union in the present case has gone beyond a mere advisory role and instead has assumed the full duty to "see that the provisions of these working rules are complied with." Furthermore, the Union saw to it that this enforcement function in the hands of its steward should be independent of interference from the employer. So Section 7.20 of the agreement concludes: "It is understood and agreed that the Employer is in no way responsible for the performance of these functions by the steward."

We can readily agree that when a union assumes only an advisory capacity with respect to safety and the enforcement of safety regulations so far as the union is concerned is limited to only the usual grievance machinery, then the union is carrying out purely a representative function on behalf of its members and should be limited in its responsibility to performing that representation in a fair and honest manner. In such

case, the safety situation would be no different from the many cases cited by defendants where a union has been charged with failure to represent its member in the presentation and processing of the employee's grievance and where the union has been held liable only under the test of fair representation. See *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 863, 11 L.Ed.2d 370 (1964); *Dente v. International Organization of Masters, Mates and Pilots, Local 90,* 492 F.2d 10 (9th Cir. 1974); *De Arroyo v. Sindicato De Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281 (1st Cir. 1970); *Bazarte v. United Transportation Union,* 429 F.2d 868 (3rd Cir. 1970). In that type of case, the handling of employee grievances are properly treated as no more than a recognized extension of the collective bargaining process.[1]

Here, however, the Union has chosen to go far beyond a mere advisory status or representative capacity in the processing of grievances.[2] Rather, it has taken over for itself a managerial function, namely the full independent right to enforce safety requirements. With its demand for and successful acquisition of that management right, it must also accept the concomitant responsibility. Under the terms of this particular collective bargaining agreement, the safety responsibility assumed by the Union is separate and distinct from the normal and usual duties of a purely representative nature such as those involved in the processing of grievances. As Judge Hunter properly held in *Helton v. Hake, supra,* defendants here should be held to answer for their breach of tort duty to use due care.

### III.

Defendants contend next that plaintiffs are barred from recovery because of contributory negligence on the part of Helton. They point to the evidence that Helton was aware of the danger from the power line, that he appreciated the danger, and that he actually expressed apprehension of working in proximity to the power line. However, at the same time, Helton had some right to rely upon the implied assurances of Loethen and Hake that there was no substantial danger and that he was safe in continuing to work.

The rule is well settled that a workman's knowledge of a dangerous condition precludes recovery only where the danger is so obvious that a man of ordinary prudence would refuse to do his employer's bidding; and the question of whether the danger was so obvious and imminent as to make it contributory negligence for him to continue is usually a question for the jury. *Burkard v. A. Leschen & Sons Rope Co.,* 217 Mo. 466, 117 S.W. 35 (1909). In judging whether the danger was obvious and imminent, it is proper to take into consideration that the foreman Loethen and the Union steward Hake were present when Helton voiced his apprehensions about the power line, but they both ignored that expression by Helton and despite that protest let the work go forward. Not only that, but they themselves as well as other workmen con-

---

1. It is to be particularly noted that Judge Anderson in *House* was concerned about the practical aspects of opening up unions to liability in tort, and in that connection he speaks in footnote 10 on p. 946 about the potential impact upon the handling of grievances and the overloading of grievance machinery. Such concern would be justified if tort liability were recognized under the facts of *House.* No similar potentiality exists by reason of recognizing tort liability on the part of the Union here for failing to properly perform its duty under Section 7.20 of its agreement.

2. Section 7.21 of the collective bargaining agreement here does provide for a safety re- view committee, parallel to the committees provided for in *Bryant* and *House.* Article 8 of the agreement here also provides grievance procedure parallel to that in the two cases mentioned. However, the additional unilateral enforcement power given to the Union steward under Section 7.20 of the contract here is over and beyond anything contained in the *Bryant* or *House* agreements. While the steward under Section 7.20 could not call a work stoppage to enforce the safety rule of Section 7.28, there were other unilateral enforcement methods available to him, as he conceded in his testimony.

tinued to work at that place and under the same conditions. Still further, even after the accident a number of the workmen, including Hake and Loethen, testified in court that they did not consider the work being done as particularly dangerous. The jury could believe that these other workmen honestly believed the proximity of the power line not to be an imminently dangerous condition and yet believe that they were mistaken in that opinion, with the net result that reasonable and honest men might differ as to whether the danger was obvious and imminent. *Cole v. St. Louis Transit Co.*, 183 Mo. 81, 81 S.W. 1138, 1141 (1904). A number of Missouri cases have held under situations fairly comparable to the one at bar that the injured workman was not contributorily negligent as a matter of law. *Burkard v. A. Leschen & Sons Rope Co., supra* ; *Cole v. St. Louis Transit Co., supra* ; *Laemore v. Lehrack,* 248 S.W. 639 (Mo.App.1923); *Nash v. St. Joseph Lead Co.,* 238 S.W. 584 (Mo.App.1922).

■ Defendants assert that Helton had safer alternatives available to him so that his choice of an unsafe manner of work was a voluntary exposure to the risk. They say for example that he should have brought up the angle irons while sitting down rather than standing up. There is considerable doubt from the evidence whether one way was any better accepted than the other. However, even assuming that it would be safer to handle the angle irons while sitting down, the evidence is uncertain and contradictory as to how Helton was actually working. Loethen testified that "when I seen him he was standing up," but Loethen did not see Helton fall. McCormack on the other hand, last saw Helton "crouched down" and "sitting down" just before he toppled off. Inasmuch as nobody actually saw Helton or just what he was doing at the time of the electrocution, weight should be given to the presumption that he was handling himself and doing his work in a manner which accorded with due care. *Privette v. City of West Plains,* 93 S.W.2d 251 (Mo.App.1936); *Hamilton v. Laclede Electric Cooperative,* 294 S.W.2d 11 (Mo.1956).

■ Defendants make other suggestions as to reasonable alternative ways in which they say Helton might have done his work. However, it appears that he was doing his work in the usual manner, and it does not appear he had been shown any other manner of work either by the foreman or by the Union steward. Under those circumstances he should not be held guilty of contributory negligence as a matter of law. *Longacre v. Farmers' Elevator, Mercantile & Manufacturing Co.,* 246 S.W. 632 (Mo.App.1923). See also *Phares v. Century Electric Co.,* 336 Mo. 961, 82 S.W.2d 91 (1935).

IV.

Defendants complain next that a class action cannot be maintained because there was no showing by plaintiffs that representatives of the class were fairly chosen and would adequately and fairly represent the members of the class. They argue that Section 507.070 [3] and Rule 52.08 require that a hearing be held with respect to these matters and since there was no such hearing and no evidence on the subject, these provisions have been violated.

■ Defendants make no mention of Rule 52.10, governing actions by or against unincorporated associations, and which related to the present situation rather than Rule 52.08 which is cited by defendants. See *Owens v. Savage,* 518 S.W.2d 192 (Mo. App.1974). It should be noted that Rule 52.10 provides that "[n]othing in this Rule shall be construed to affect the rights or liabilities of labor unions to sue or be sued." The quoted portion of Rule 52.10 has the purpose of preserving the traditional method by which labor unions sue and are sued. This is under the equitable doctrine of virtual representation which exists independent of statute or court rule. *State ex rel. Allai v. Thatch,* 361 Mo. 190, 234 S.W.2d 1 (banc 1950).

■ Inasmuch as under that doctrine the Union is sued in a representative capac-

3. All statutory references are to RSMo 1969.

ity, any challenge to the Union's right to be sued must be by specific negative averment. Section 509.140 and Rule 55.13. Where, as here, there is no specific negative averment challenging the Union's capacity, no issue in that respect is presented. *Heath v. Motion Picture Machine Operators Union No. 170,* 365 Mo. 934, 290 S.W.2d 152, 159 (1956).

The application of that pleading rule does no injustice to the class consisting of all members of the Union. Plaintiffs named among the representatives of the class the president, the secretary treasurer and the business agent of the Union. The president of the Union actually appeared at the trial as a witness for the defense. The attorney for the Union has represented the whole class at all stages of this litigation, vigorously and with the utmost of professional skill. The whole purpose of Rule 52.08, which defendants erroneously claim to be applicable, is to insure adequacy of representation for all members of the class and to prevent collusion. *City of Des Peres v. Stapleton,* 524 S.W.2d 203 (Mo.App.1975). To any extent that Rule 52.08 is relevant here, its purpose has been well accomplished by the representation in the present case.

### V.

■ Defendants complain next that the trial court refused to allow Hake to testify that in his opinion the job was not dangerous. The short answer is that Hake did give testimony on this point and that testimony was never stricken. During the course of his testimony the following appears: "In your opinion, Mr. Hake, was this job dangerous? Answer: No, it wasn't." Although an objection was then made and sustained by the court, the evidence was before the jury and never withdrawn.

Moreover the testimony in question by Hake was merely cumulative of like testimony given by Loethen and McCormack. Assuming that the ruling by the court sustaining the objection to Hake's testimony was error, that error under all the circumstances cannot be deemed prejudicial.

### VI.

■ On their cross-appeal, plaintiffs contend that the court erred in refusing to submit Instructions 14, 15, 17 and 18 relating to punitive damages. The point based on these instructions is not properly before us for consideration, because of plaintiffs' violation of Rule 84.04(e) which requires that if a point relates to the refusal of an instruction, "such instruction shall be set forth in full in the argument portion of the brief."

Aside from that, we agree with the trial court that the evidence did not justify the submission of any issue on punitive damages.

No error having been shown on either appeal, the judgment is affirmed. Costs will be divided equally between the parties.

All concur.