726 P.2d 742

Tharon RAWSON, individually and as Guardian ad Litem for her minor children, Seth Rawson and Cindy Rawson, heirs of John P. Rawson, deceased, Plaintiff-Appellant,

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, Defendant-Respondent.

Berniece JOHNSON, individually and as Guardian ad Litem for Michael Wayne Johnson, Ruth Ellen Johnson and John Russel Johnson, Plaintiff-Appellant,

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, Defendant-Respondent.

Laura DUNBAR, as Guardian ad Litem for Rickina Rossiter and Glen Rossiter, Jr., minor children and heirs of Glen Raymond Rossiter, Plaintiff-Appellant,

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, Defendant-Respondent.

Mary WOOD, as Guardian ad Litem for Leslie D. Wood, her minor child, heir of Don B. Wood, deceased, Plaintiff-Appellant,

v.

UNITED STEELWORKERS OF AMERICA, an unincorporated association, Defendant-Respondent.

No. 15338.

Supreme Court of Idaho.

Sept. 4, 1986.

Kenneth B. Howard, Jr., Coeur d'Alene, Lloyd J. Webb, Twin Falls, and Bruce O. Robinson, Bonners Ferry, for plaintiff-appellant.

Margaret L. McMahon, Caldwell, George H. Cohen, Washington D.C., Robert M. Weinberg, James D. Nelson and Frederick V. Betts, Seattle, Wash., for defendant-respondent.

1986 Opinion No. 30, Issued February 24, 1986, is Hereby Withdrawn and this Opinion is Substituted Therefor.

## ON REHEARING

HUNTLEY, Justice.

By this appeal, we are called upon to review a trial court's order granting summary judgment to the United Steelworkers of America (hereinafter referred to as U.S.W.A. or the Union) in an action brought by representatives of estates of four miners (hereinafter referred to as "the Miners") who lost their lives in the 1972 Sunshine Mine fire at Kellogg, Idaho, against the Steelworkers' Union on theories of negligence and fraud.

Judge Prather's memorandum opinion in support of his order granting the Steelworkers' Union's motion for summary judgment of dismissal of the complaint stated his conclusions:

(1) That the U.S.W.A. was entitled to summary judgment on the Miners' fraud claims;

(2) That the U.S.W.A. was entitled to summary judgment on the Miners' negligence claims; and

(3) That the record established that the Miners' claims related exclusively to the manner in which the U.S.W.A. exercised its authority as collective bargaining representative of the employees at the Sunshine Mine and, hence, that this Court should again consider the issue of whether the Miners' claims are preempted under federal labor law.

We affirm the order of summary judgment as to the fraud claim. However, for reasons discussed *infra*, we reverse the order of summary judgment as to the negligence claim and remand for further proceedings.

## I. THE FRAUD CLAIM

The amended complaints allege that the U.S.W.A. made the following representations to its members at the Sunshine Mine:

A. That it was a competent organization for protecting the welfare, safety and interest of its members, and had a concern for said welfare, safety and interest of its members.

B. That it had a reliable degree of expertise in underground mining.

C. That it would develop adequate programs of safety through its Union representatives for the benefit of its members, the rank-and-file of said Union.

D. That it would provide competent Union representatives to participate in the inspections of the mine for safety and accident prevention.

E. That it would enforce the provisions of the Union contract with the Sunshine Mine with regard to safety and accident prevention.

The complaints allege that the above representations were false, that they were relied upon by the employees, and that they were a proximate cause of appellants' decedents' death.

■ The Miners' brief does not specify whether their claim is one of actual fraud or constructive fraud. However, a party asserting a cause of action based on fraudulent misrepresentation must prove each of the following elements: a representation; its falsity; its materiality; the speaker's knowledge of its falsity or ignorance of its truth; the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; the hearer's ignorance of its falsity, reliance on its truth, right to rely thereon, and consequent and proximate injury. *Smith v. King*, 100 Idaho 331, 597 P.2d 217 (1979).

■ In an action to prove actual fraud, the claimant must prove that the other party acted with an intent to deceive. *Sorenson v. Adams*, 98 Idaho 708, 571 P.2d 769 (1977). In a case of constructive fraud, that element is not required. *State v.*

*Hightower,* 101 Idaho 749, 620 P.2d 783 (1980); *Bethlamy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966); *McGhee v. McGhee,* 82 Idaho 367, 353 P.2d 760 (1960).

■ Summary judgment should be granted only when the pleadings, depositions and admissions, together with affidavits, if any, show that there is no genuine issue as to any material fact. The facts are to be liberally construed in favor of the party opposing the motion, who is also to be given the benefit of all favorable inferences which might be reasonably drawn from the evidence. *Anderson v. Ethington,* 103 Idaho 658, 651 P.2d 923 (1982).

■ The record reflects that the U.S. W.A. submitted evidence establishing that it did not represent to the Miners that it had expertise in mine safety or that it could ensure a safe work place. Respondents failed to present evidence contradicting the U.S.W.A.'s showing. When a motion for summary judgment is made and supported by affidavit, an opposing party may not rest upon his pleadings, but must respond by affidavit, deposition or interrogatory setting forth specific facts showing there is a genuine issue for trial. As the trial court observed in its decision granting the Union's motion for summary judgment on the fraud claim:

> The record is ... bereft of evidence the defendant Union made misrepresentations of fact or that the defendant intended to defraud plaintiffs. On the other hand, the defendant has submitted testimony that the Union did not misrepresent its expertise; the Union members were aware the Union only acted in an advisory capacity and that the primary responsibility for ensuring job safety lay with each individual Union member and the company.

■ Since the record reflects that appellants relied only on their pleadings and did not produce the necessary documentation to show that there was a genuine issue for trial, the trial court did not err in granting the motion for summary judgment on the fraud claim.

## II. THE NEGLIGENCE CLAIM

The trial court also granted the Union's motion for summary judgment of dismissal on the Miners' negligence claim. The court concluded that the Miners' had not established that the Union owed a duty to the deceased miners. The trial court's memorandum opinion in support of its order granting the motion for summary judgment on the negligence claims reads:

> Plaintiffs seek to hold the Union responsible on negligence theories. A fundamental component of a negligence claim is the existence of a duty toward another. *Hoffman v. Simplot Aviation, Inc.,* 97 Idaho 32, 539 P.2d 584 (1975). A duty is a standard of conduct to which the defendant is required to conform. *Algeria v. Payonk,* 101 Idaho 617, 619 P.2d 135 (1980). Plaintiffs rely on the collective bargaining agreement and RESTATEMENT (SECOND) OF TORTS, §§ 323 and 324A (1965), as the sources for the legal duty owed by defendant Steelworkers.
>
> A breach of contract is not in and of itself a tort. A contract may, however, create a situation which furnishes the occasion for a tort. When a person renders services to another pursuant to a contract or otherwise, the law imposes a duty of care in the performance of those services. "The duty of care arises ... irrespective of contract," and "[t]here must be a breach of duty apart from the non-performance of a contract." *Taylor v. Herbold,* 94 Idaho 133, 484, [483] P.2d 664 (1971). Mere failure to carry out contractual obligations cannot support a tort action while misfeasance in the performance of contract obligations may support a tort action.
>
> Plaintiffs complain the Union "failed to develop an adequate program for inspection and for safety, ... failed to inspect," and "failed to require other safety devices to be used." Clearly the plaintiffs are upset with what the Union did not do, not with what it did do. Non-perform-

ance of alleged contractual duties will not sustain a tort claim.

The "Good Samaritan Doctrine" is enunciated in RESTATEMENT (SECOND) OF TORTS, §§ 323 and 324A. Section 324A reads:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for the physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:

(A) his failure to exercise reasonable care increases the risk of such harm, or

(B) he has undertaken to perform a duty owed by the other to the third person, or

(C) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Section 323 is substantially the same as 324A except it deals with the situation where an individual undertakes to render services directly to another person.

We start with the premise there is no duty to be a good Samaritan. The law will only hold a defendant liable if the plaintiff can meet the criteria laid down by the RESTATEMENT. This Court has already held there is no proof the plaintiffs' decedents relied on the Union's safety activities. Therefore, the third possible criteria, that the harm is suffered because of reliance of the third person upon the undertaking, is not satisfied. Neither has the first criteria, i.e., the failure to exercise reasonable care increased the risk of harm, been met. In *Clemente v. United States,* 567 F.2d 1140 (1st Cir.1978), the plaintiffs sued over the death of Roberto Clemente and two other passengers and crewmen in a private airplane crash. The plaintiffs alleged Federal Aviation Administration employees had acted negligently in failing to warn Clemente and other passengers the airplane was overweight and

lacked a proper flight crew. The FAA had promulgated an internal order saying, "clear indication of alleged illegal flights should be made known to flight crew and persons chartering the service."

The appeals court held the defendant United States could not be held liable on the Good Samaritan theory.

While the Federal Aviation Act empowered the administrative staff on the FAA to issue an order such as SO8430.20C, the Act itself does not require this conduct. The agency, in issuing the order, was acting entirely gratuitously and was under no obligation or duty to plaintiffs' decedents or any other passengers.

[T]he *Restatement of Torts (Second),* §§ 323 and 324A n makes it clear that liability in such a situation must be predicated on one of three grounds: the conduct of the employee actually increased the risk of harm to the damaged firm; the harm to the damaged firm resulted from his reliance on the employee carrying out the inspection as ordered; or there existed a prior duty to inspect owed by the employer to the damaged firm.... There was no underlying statutory duty to offer a special protection to plaintiffs' decedents; the failure to inspect *in no way added to the risk* of injury to the passengers or crew; and there is no evidence that anyone relied on the contents of SO8430.20C and limited their own safety precautions accordingly. (emphasis supplied).

Like *Clemente,* the Union's alleged failure to inspect, warn and make safe did not increase the danger to the miners beyond that under which they were operating. The Steelworkers may not have helped the miners' safety problems, but they did not augment them either. See also *Blessing v. United States,* 447 F.Supp. 1160 (E.D.Pa.1978). The Court notes the case at bar is also akin to the *Clemente* case in that there is no evidence the rank-and-file Union members

limited their own safety precautions because of Union activities.

Lastly, the defendant did not undertake to perform the safety functions owed by Sunshine Mine to the rank-and-file. The collective bargaining agreement clearly placed the responsibility for making the work place safe upon Sunshine Mine.

> The company shall continue to make reasonable provisions for the safety and health of its employees at the plant during the hours of their employment....
>
> ... Advice of the safety committee, together with supporting suggestions, recommendations and reasons shall be submitted to the plant manager for his consideration and for such action as he may consider consistent *with the company's responsibility to provide for the safety and health of its employees* during the working hours of their employment and the mutual objectives set forth in section 1. (emphasis supplied).

The collective bargaining agreement makes it very clear the primary responsibility for the rank-and-file members' safety and health was placed upon the company as opposed to the Union which could only act in an advisory capacity. The Union could talk all it wanted to but when it came right down to it, the Union was without authority to force any safety and health measure upon the company except in highly limited, and for our purposes here, irrelevant circumstances. Herein lies the central factor in this dispute. The technical requirements of the RESTATEMENT aside, it is fundamentally unfair to hold a party liable for a condition it did not create or worsen and which it had no jurisdiction to correct. Summary judgment is granted dismissing all of plaintiffs' negligence claims.

The memorandum decision of the learned trial court is well-reasoned but proceeds from a faulty focus in several respects: First, the trial court embarks upon a lengthy analysis of whether the Miners' claim meets the requirements of Restatement of Torts (2d), Sections 323 and 324A, which he characterizes as the "Good Samaritan Doctrine." From there, the court reasons plaintiffs' cause fails because nonperformance (as distinguished from misfeasance) will not support a tort action, the trial court stating:

> "Clearly the plaintiffs are upset with what the Union did not do, not with what they did do."

Both premises are incorrect. The record establishes that the Union's safety undertaking was not the act of a "Good Samaritan" but was, in fact, a substantial part of the Union's offering in consideration of the workers' membership and payment of dues. The Collective Bargaining Agreement provided for the Union's safety inspection function, which service was bought and paid for by union dues. In any event, it provides an incorrect focus to view and interpret Sections 323 and 324A under the rationale of the Good Samaritan Doctrine—the Restatement does not so characterize those sections and their specific language includes the rendering of services "for consideration." In this regard, the address of I.W. Abel, President of the U.S.W.A., in his November 1969 address to the delegates to the "International Conference of Safety and Health of the Steelworkers' (Appendix A hereto), is instructive. Moreover, the characterization of the Miners' claim as one for mere nonfeasance which did not increase the risk of harm is incorrect. As the analysis below will demonstrate, the Union, through its representatives, did embark upon safety inspections, and the issue is whether they negligently performed that undertaking, or whether the Union's negligent performance resulted in the men being subjected to increased hazards or potential for death on the date of the fire and explosion than would otherwise have been the situation had the inspections been performed without negligence.

As its second premise for its dismissal of the negligence cause the trial court opens:

> Lastly, the defendant [USWA] did not undertake to perform the safety functions owed by Sunshine Mine to the rank-and-file. The collective bargaining

agreement clearly placed the responsibility for making the work place safe upon Sunshine mine.

However, a more detailed exposition below will demonstrate the Miners' cause is not premised on either a claim that the Union should perform management's safety functions or that the Union should make the workplace safe—rather, the cause of action is premised upon the Union negligently performing those safety functions which it did, in fact, undertake.

Recently, in *Carroll v. United Steelworkers of America,* 107 Idaho 717, 692 P.2d 361 (1984), this Court ruled that mere nonfeasance, even if it amounted to willful neglect to perform a contract, is insufficient to establish duty in tort. In *Carroll,* a Union member accused his Union of failing to perform protective actions relative to conducting safety inspections at the work site, but did not allege negligent performance of those actions once undertaken. In *Carroll,* no inspections were made. In the instant case, by contrast, the safety committee did inspect the mine and the miners allege *not* that the Union members of the safety committee *failed* to inspect, but that they actually performed the duty of inspection in a negligent manner and failed to report what should have been obvious safety problems, the duty to report necessarily flowing from the act of inspection. Hence, the instant case does not present a situation of non-feasance, but one of malfeasance.

The Miners assert that the basis of a negligent undertaking is established in this case under *both* the collective bargaining agreement and the Constitution of the Union. The Constitution of the International Union and of the Local Union provided in pertinent part:

> Object ... to establish through collective bargaining adequate wage standards, shorter hours of work, and improvements in the conditions of employment for workers and industry.
>
> .  .  .  .  .
>
> A safety and health committee under the direction of the International Union or its

designated representative, shall be established in each Local Union.

At the time of the fire, there existed a collective bargaining agreement between the Union and the Sunshine Mining Company, dated March 11, 1970, which provided in Article 9, Section 1, the following:

> The Company and the Union will continue to cooperate toward the objective of eliminating accident and health hazards. The Company shall continue to make reasonable provisions for the safety and health of its employees at the plant during the hours of their employment. Protective devices, wearing apparel and other equipment necessary to protect employees from injury shall be provided by the Company in accordance with practices now prevailing in each separate department or as such practices may be improved from time to time by the Company.
>
> An employee who believes that he is being required to work under conditons [sic] which are unsafe beyond the normal [sic] hazards inherent in the operation in question, may request an immediate meeting with the shift boss, with or without consultation with his Assistant Grievance Committeeman. If, as a result of these actions, the employee still believes he is being required to work under conditions which are unsafe beyond the normal hazards inherent in the operation in question, a committee consisting of two (2) supervisory personnel and two (2) reliable employees, approved by the Union, shall inspect the operation in question within twenty-four (24) hours and shall decide what steps, if any, are necessary to correct the hazard.
>
> In the event the committee cannot agree, the employee involved may then file a grievance in Step 2 of the grievance procedure. It is understood and agreed that if a grievance is filed on an unsafe working condition, management and Union representatives shall give said grievance preferred handling, and shall expedite its movements through the grievance procedure.

The employee may on request, be relieved from the job and be assigned to other work at the discretion of the Company. If an employee exrcises [sic] his rights under this section and the Company believes conditions are not beyond the normal hazards inherent in the operation in question, nothing contained in this section shall abridge the rights of the Company under other sections of this Agreement.

Neither shall the foregoing preclude the Company from assigning another employee to the job in question and it is further understood that no employee, other than communicating the facts, shall take any steps to prevent another from working on the job.

A Safety Committee consisting of three employees designated by the Union and three Management members designated by the Company shall be established. By mutual agreement, the committee may be increased to not more than six representatives for each party. The safety committee shall hold regular meetings at times determined by the committee. The function of the safety committee shall be to advise the Plant Manager concerning safety and health matters but not to handle grievances. In the discharge of its function the safety committee shall: Consider existing practices and rules relating to safety and health, formulate suggested changes in existing practices and rules, and recommend adoption of new practices and rules. Advice of the safety committee, together with supporting suggestions, recommendations and reasons shall be submitted to the Plant Manager for his consideration and for such action as he may consider consistent with the Company's responsibility to provide for the safety and health of its employees during the hours of their employment and the mutual objectives set forth in Section 1.

A Union member and a Management member of the safety committee may accompany the State Mine Inspector or his Deputy, on any inspection made at the property.

Two men shall be designated by the Union to accompany the Safety Engineer on the tours of the mine. Once each month, one of these two men, together with the Safety Engineer, shall make a tour of a section of the mine. The results of this tour shall be considered at the following Union-Management safety committee meeting.

In the event a recommendation with respect to safety conditions that needs action immediately, concurred in by a majority of the entire committee, is not carried out, the Union may have recourse to the greivance [sic] procedure.

Affidavits established that a health and safety committee was formed. As a matter of practice within the Union, the committee members of the health and safety committee required by the constitution were also members of the joint safety committee required under the collective bargaining agreement. The Miners assert that since the inspections and recommendations regarding practices and rules were services to be performed by the Union for the benefit of its member miners, the Union had a duty to use due care in performing these services.

The Restatement (Second) of Torts, § 323 (1977) states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm,

(b) the harm is suffered because of the other's reliance upon the undertaking.

The Miners assert that evidence was presented to establish the following:

(1) John Rawson, Glen Rossiter, Wayne Johnson and Don Wood did not have the use of self-rescuers (oxygen masks and cannisters);

(2) Self-rescuers were stored in boxes with padlocks;

(3) Some of the self-rescuers were eighteen years of age and were corroded so that the valve could not be turned to operate them;

(4) Some of the self-rescuers were inoperative and others were used by miners who sensed them getting hot and discarded them not knowing that the development of heat was an indication that the self-rescuer was working;

(5) The miners did not know how to use self-rescuers that may have been available and had not been trained in their use;

(6) No self-rescuers were stored at the 5,400 level where John Rawson and Glen Rossiter were stationed; at other levels there were fewer cannisters than the usual number of men working at those levels; and that there were only six units at the major escape route at the 3,100 foot level.

(7) There were no periodic fire drills or evacuation drills for miners working underground;

(8) There were no opportunities for the miners under controlled circumstances to become familiar with proper exit procedures and sequences; and

(9) There were no periodic checks or tests made of a stench warning system and many of the survivers testified to facts permitting the inference that the system did not work.

(10) Evidence exists that the fire was started by spontaneous combustion in a pile of accumulated rubbish.

The Miners contend that most of these deficiencies could have been observed, and should have been observed, in the course of a reasonable inspection and, further, that recommendations could have, and should have, been made with regard to these deficiencies. A reasonable inference which the trial court should have drawn in favor of the miners is that the inspecting personnel were negligent in not seeing and reporting some of those conditions. We cannot say as a matter of law that had the inspectors reported these blatant violations to the

committee, with the committee in turn reporting them to management, that management would have corrected these defects—but neither was the trial court correct on summary judgment to resolve that factual issue the other way. Rather, such is an issue of proximate cause not properly resolved on summary judgment. The record is devoid of any opposing affidavits or deposition testimony that the inspections were, in fact, conducted in a reasonable and prudent manner in accordance with recognized standards.

Construing the facts and the inferences most favorably toward the parties against whom summary judgment is sought, and absent a record establishing that management had no concern for safety, the reasonable inference would be that management would have acted responsibly had these matters been brought to its attention.

■ In light of the above record, we cannot conclude as a matter of law that the Union owed no duty to exercise due care in performance of the inspections once its personnel undertook them. Moreover, we cannot conclude as a matter of law that the Union owed no duty to bring to the attention of the members of the safety committee the safety problems that existed in the Sunshine Mine. Because the Union, pursuant to the provisions of the collective bargaining agreement, had contracted to inspect and, *in fact, inspected* the mine, it owed the (minimal) duty to its members to exercise due care in inspecting and in reporting the findings of its inspection. For this reason, we reverse the trial court's order granting the Union's motion for summary judgment of dismissal as to the negligence claims.

## III. THE PREEMPTION ISSUE

■ In *Dunbar v. United Steelworkers of America*, 100 Idaho 523, 602 P.2d 21 (1979), which case arose out of the same facts as the instant appeal, this Court held on remand that material issues remained regarding whether the Union had a duty to inspect and whether it breached that duty.

In *Dunbar*, the question of the existence of a duty was never reached since the trial court held that the cause of action was preempted by the federal duty of fair representation. Justice Bakes, specially concurring in Part I of *Dunbar*, wrote:

I concur with the majority's ruling that the trial court erred in dismissing the appellants' wrongful death action against respondent United Steelworkers because of the preemption doctrine. An action for wrongful death is a creature of our state statutes, is of substantial local interest, and traditionally has been committed to the jurisdiction of the courts of the state. Moreover, this action for wrongful death is unlikely to present the identical legal issues as a proceeding under the federal labor laws arising from this same factual setting. Assertion of jurisdiction by the courts of this state over the appellants' action would appear to present no significant risk of undue interference with national labor policy. 100 Idaho at 546–547; 602 P.2d at 44–45.

No provision of the National Labor Relations Act provides that it is federal policy to immunize labor unions from responding in tort for their negligent acts. In *Brown v. Hotel & Restaurant Employees & Bartenders*, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984) the court noted:

The National Labor Relations Act ... leaves much to the state, though congress has refrained from telling us how much.

The Union argues that *all* relationships between a union and its members flowing from a collective bargaining agreement are preempted, with the union's duty being only that of "fair representation." This leads to some rather fuzzy analysis. "Preempt" is defined as "to seize upon to the exclusion of others," Webster 3d Int'l Dictionary. Although the NLRB has been given exclusive jurisdiction to regulate and interpret collective bargaining agreements as to ongoing performance and modification, the NLRB has not been given (nor has it seized) the function of considering tort damages for wrongful death for past union misfeasance. We remain of the view expressed by the majority of this Court in *Dunbar*, 100 Idaho at 527, 602 P.2d 21.

We are cited to no authority, for example, which insulates a union for its negligent and tortious conduct toward one of its members, i.e., if a member of a union was struck by a motor vehicle owned by the union and operated by one of its officials during the course of his employment for the union, we cannot believe the union would be insulated from liability on the basis that the only duty it owed toward its members was that of fair representation. If a union's unreasonable conduct results in the death of one of its members, it should not be excused from liability because of the legal fortuity of its organizational status anymore than if its conduct brought death to a nonunion member.

Recently in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) the United States Supreme Court held that when resolution of a state-law claim is substantially dependent upon analysis of the terms of a collective bargaining agreement, that claim must either be treated as a § 301 claim or dismissed as preempted by federal labor-contract law. In *Allis-Chalmers*, the United States Supreme Court reversed a Wisconsin Supreme Court decision which had held that a claim that a Union had handled an insurance claim in bad faith was not preempted because under Wisconsin law the tort of bad faith is distinguishable from a bad-faith breach-of-contract claim, and that although a breach of duty is imposed as a consequence of the relationship established by contract, it is independent from that contract. In reversing the Wisconsin decision, the United States Supreme Court concluded that the right asserted by the Union member was rooted in contract, and the bad-faith claim could have been pleaded as a contract claim under § 301. The Court concluded that unless federal law governed that claim, the meaning of the disability-benefit provisions of the collective bargaining agreement would be subject to varying interpretations, and the congressional goal

of a unified body of labor-contract law would be subverted. The *Allis-Chalmers* Court stated, "Because the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation.... These questions of contract interpretation, therefore, underlie any finding of tort liability, regardless of the fact that the state court may chose to define the tort as 'independent' of any contract question. Congress has mandated that federal law govern the meaning given contract terms. Since the state tort purports to give life to these terms in a different environment, it is preempted." 105 S.Ct. at 1914. In the instant case, however, we need not interpret a contract. The appellants are suing for breach of a duty to inspect and report under the reasonable and prudent person standard.

Both the Union, on appeal, and the trial court, in its memorandum decision, urge this Court to reconsider its holding in *Dunbar*. The trial court stated:

This case does not involve a collective bargaining agreement whereby the Union assumed management safety responsibilities and therefore management's common law duties. In *Helton v. Hake*, 564 S.W.2d 313 (Mo.1978), the collective bargaining agreement provided the Union steward would ensure no work was done in the immediate area of high tension lines. The agreement distinctly said the employer was in no way responsible for the performance of these safety functions by the steward.

. . . . .

... When the Union takes actual authority for enforcing safety conditions on the work site away from management, it should be held responsible for breaches in a duty of care just as management would have been at common law. The defendant Union's collective bargaining agreement with Sunshine did not allow the Union to enforce safety measures. The Sunshine/Steelworkers' contract did say the Union "shall inspect," but the Union could do nothing but advise once it had been reported.

While the trial court concluded that *Helton* supported the Union's position, in fact it supports that of the Miners. In *Helton*, the Missouri court stated:

The complaint alleges that the union, through its agent, the steward, negligently and carelessly failed to enforce the safety rule relating to work in the area of high tension power lines. The suit is clearly brought as an action in tort seeking recovery for wrongful death due to the alleged negligence of the defendants. The only relevance of the collective bargaining agreement appears to be that it would determine, to some extent at least, the nature and scope of defendants' duty. 564 S.W.2d at 318.

Likewise, in the instant case, the provisions of the collective bargaining agreement do not require interpretation, as was the case in *Allis-Chalmers*, *supra*, but rather the provisions determine only the nature and scope of the Union's duty. The trial court acknowledges that the Union had a duty to "advise;" and it is *that* duty which appellants contend was breached. Whether the Union breached the duty, and whether such breach, if established, was the actual or proximate cause of the appellants' decedents' deaths, are not issues addressed by this appeal. Our narrow holding today is that the Union, having inspected, assumed a duty to use due care in inspecting and, from the duty to use due care in inspecting arose the further duty to advise the committee of any safety problems the inspection revealed. Moreover, since an action for wrongful death is a creature of our Idaho statute, is of substantial local interest, and traditionally has been committed to the jurisdiction of the courts of the state, and because the instant action does not require an interpretation of the terms of the collective bargaining agreement, we do not consider it to be preempted by federal law.

In *Hechler v. Intern. Broth. of Elec. Workers, AFL–CIO*, 772 F.2d 788 (11th Cir.1985) the court correctly analyzed the

non-applicability of the preemption doctrine to cases of this nature.[1]

In *Hechler*, the court held the employee's state law action does not run afoul of the recent pronouncement in *Allis-Chalmers Corp. v. Lueck*, in which the Court found preempted a state action for bad-faith handling of an insurance claim arising out of a disability insurance plan included in a collective bargaining agreement. The tort in that case was essentially a product of the labor contract itself—without the contract, no tort claim could have existed. In this case, the claim is essentially one of common law negligence for breach of a duty of care. Liability will turn on basic negligence principles as developed by state law.

■ A union breaches its duty of fair representation only when it treats an individual in an arbitrary, discriminatory, or bad faith manner. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Two key issues must be addressed to determine whether a common law negligence action is preempted by the federal remedy for breach of such a duty.

*First*, a court must determine whether the duty the union allegedly breached is so inextricably intertwined with the collective bargaining agreement that only a duty of fair representation claim is available. *Second*, in making this determination, the court must be aware of federal labor law policy and whether a negligence action against a union impermissibly impedes upon the federal labor-management regulatory scheme.

With regard to the later concern, the primary inquiry is whether the duty sought to be enforced against the union ... is so tangential ... to the federal scheme that the [action] is properly exempted from the [general] preemption rule. [B]alancing of the relevant factors

leads [to a conclusion] that [the employee's] negligence claim is not preempted. *Hechler*, 772 F.2d at 796.

■ The union's duty of fair representation does not displace those duties created by state law that prohibit a person or corporation from engaging in tortious conduct resulting in death or injury.

[N]othing in the [federal] statutory scheme expressly addresses such conduct or provides a mechanism for its redress. Likewise, it cannot be said that by failing expressly to [address] acts of negligence by unions, Congress intended to permit unions to engage in such acts free of the scrutiny of state courts. *Hechler*, 772 F.2d at 796–97.

Nor is the union's contractual duty to assure worker training ... inextricably intertwined with its federal duty of providing fair representation.... [T]he fact that ... reference to a collective bargaining agreement must be made in order to define the scope of the ... duty does not [mean that a negligence action is] no more than a [preempted] § 301 action. [E]ven if the state action threatens adjudication of matter cognizable by the [National Labor Relations] [B]oard or by a court adjudicating federal labor law, the extent of that threat [must be balanced] against the importance of the action to the state. [N]o impermissible conflict ... [e]xists in this case. *Hechler*, 772 F.2d at 797.

We agree with the *Hechler* analysis. Counsel for the union advises that the Supreme Court of the United States entered an order on May 19, 1986, granting review of *Hechler* and urged that if we reverse and remand, we should, in the interest of judicial economy, direct stay of proceedings until the Supreme Court acts. Since this

1. The *Hechler* court blinked and waffled shamefully by its final qualifying paragraph:

We emphasize at this point the narrow scope of our holding.... This case is distinguishable from [earlier cases] in which the plaintiff sought relief from the union for a breach of its general duty to inspect for safety and for the benefit of the entire work force in the work place pursuant to the collective bargaining agreement. In [this] case, the plaintiff alleges a duty running from the union to her individually that required [it] to assure that she was first qualified to work in a dangerous electrical substation on the job assigned to her prior to her assignment. 772 F.2d at 797–798.

cause of action arose fourteen years ago, and since the parties have not had a hearing on the merits of such a proposal, we decline to direct a stay without prejudice to the right of either party to assert the request before the trial court.

Affirmed as to the fraud claim, reversed as to the negligence claim and remanded to the trial court for further proceedings consistent with this opinion.

Costs to appellants. No attorney fees.

BISTLINE, J. concurs.

DONALDSON, C.J., concurs in the result.

## APPENDIX A

### I.W. ABEL

*President*

United Steelworkers of America

Thank you very much, Director Schremp, our good friend and your host director on this great occasion, Director Germano, Chairman of our National Committee and Board Members on Safety and Health, Board Member Younglove, Director Thornton, and associates of Paul's, Marco, Adolph and Al Skinner, members of the staff and this great assembly of delegates to the International Conference of Safety and Health of the Steelworkers.

I perhaps should start off this morning, Joe, in the tradition of the times by spending a few minutes, a half hour, three-quarters, berating you over the conditions of the climate here in this great City of Chicago. In keeping with the times, I should say it is your fault. But I should remind you that when we were here last in convention, you arranged to have it hotter than hell for us. Now you make it all but impossible to get in because of fog and smog. I, like others, had intended to get in last night but found myself grounded in the city of brotherly love, Philadelphia, because it was impossible to get here. Then this morning, after we arrived we found ourselves circling overhead for a full hour waiting our turn to come in. I couldn't

help but think as we circled, knowing the conditions, such as only one runway being used and visibility at one-half mile, that I was coming to a safety conference. I don't mind telling you as we flew around I found myself hoping that all of these wonderful safety implements that the airlines and the air industry has developed would be working in topnotch shape. I found myself hoping, too, that those poor workers, those human beings that operate this equipment would this morning be living by the rules, by the book, and I'm telling you it is a good feeling when finally you get a glimpse of the ground and then you feel yourself hit the runway to know that not only was the equipment working but the workers were working by the rules and by the book. So it was under those conditions that I come this morning.

Joe, I won't take time holding you responsible because I know in this instance, like many other instances, we get too much hell for things for which we are not responsible as it is.

I'm pleased to be here this morning to see such a great turnout. That is an indication of the tremendous interest and concern that our local unions have throughout the great countries of Canada and the United States for safety and health in our industries.

I want to thank Director Schremp for asking me to talk to you about safety and health and I also want to compliment him and his associates, outstanding individuals such as Marco and Adolph and Al Skinner for what they are doing in an area of extreme importance to our membership and what they have accomplished in a few short months since they have been given and have assumed the responsibilities of our Safety and Health Department.

This international conference signifies the increased emphasis that our Union intends to place upon the safety and health of members of the United Steelworkers of America.

There have been many changes for the better in our Union in the last few years—

increased participation in bargaining—expansion of the Industry Conference concept—a new Department of Organizing—establishment of a Strike and Defense Fund—breakthroughs · on incentives and earnings protection—highest earnings and best pensions in our history. And while all of these are important, they are no more important than the safety and health of our members that work in the mines, the mills and the factories throughout our jurisdiction.

I am not here today to perform a routine function of my office as President and say a few words of welcome as part of an opening ceremony. I am here today because I believe as strongly as I can in making the workplaces in our jurisdiction the safest and healthiest places there are.

And I am here because I also believe as strongly as I can in making our communities safer and healthier places in which to live and to bring up a family. There is no reason why steel communities must be dirty and unsafe places to work and live.

I am here today because I want to attempt to convey to you—and through you to our membership—that our Union is making occupational health and safety a top priority. That is why we have reorganized our Department of Safety and Health and given it added manpower. We may have been remiss in this area in the past. But we are not going to be remiss in the future, that I assure you.

I know, as well as you know, that safety and health are difficult subjects in which to arouse interest. Some of our members even resent being told to wear protective equipment. Others object to safety rules. But safety and health are somewhat like unemployment. An unemployment rate of 4% doesn't impress you if you are among the 96% working. But it certainly impresses the hell out of you if you are one of the 4%. To put it another way—it's a recession, we have often heard said if your neighbor's out of work; but if you're out of work, it's a depression.

Unfortunately, that's the way it is with safety and health. A healthy and unin-jured worker too often has little interest in safety and health. Of course he should not have to suffer a disabling injury or incur a disease from some dangerous toxic agent to have the kind of interest he should have. One of our jobs is to make our members—and the companies—as safety and health conscious as possible.

Unfortunately, there doesn't seem to be much "sex appeal" in industrial safety and health. It's difficult to arouse interest in these areas—not only among many workers, but among our legislators and the general public.

It has been said that the American public isn't too concerned over atomic fall-out because so far it hasn't affected television reception. Perhaps the same could be said about concern over safety and health. We, too, seldom get concerned unless and until an accident or tragedy hits home and affects us.

Now I want to cite two examples of a tragic loss of life to demonstrate my point over industrial accidents and how they relate to public and governmental interest and concern.

You all recall the horrible tragedy that took the lives of three astronauts when fire consumed the Apollo One space capsule at Cape Kennedy on January 27, 1967. The Nation properly paid tribute to the astronauts and mourned their deaths. But then there was registered great national concern and a national demand that immediate steps be taken to prevent a recurrence—and rightfully so. A seven-man board was appointed to investigate that fatal fire. After 10 weeks of investigation, the board issued a 3,000–page report which blamed a faulty wire as the probable cause and cited other deficiencies in engineering and manufacture in the Apollo project. Millions of dollars were spent and corrective measures were effected. You also recall, I am sure, the headlines and extensive publicity given the accident and investigation by all the news media.

Now, a few weeks before this tragedy struck the astronauts, three Steelworkers

were killed in an oxygen-making plant of Great Lakes Steel when a compressor blew up. Director Charley Younglove, Director of our Permanent Safety Committee of the Board, was out to the plant within a half hour or 45 minutes after the accident, and he told me the bodies of the three men could not even be identified. He told me that the compressor chamber, made of iron about 2½ to 3 inches thick, was just melted down, like melted ice. Here was an accident just as tragic as the one that claimed the lives of the astronauts—three men burned beyond identification—three men who also left behind families. But what kind of interest did this accident arouse?

It barely was given any attention even in the area where it happened. The Detroit News, for example, carried a brief item—about three inches long—on Page nine.

Here we had two separate but similar accidents—three men killed in each—three families left without fathers and husbands. Yet one gets national attention, a lengthy investigation with no effort or expense spared to prevent a recurrence—and the other goes barely noticed.

In no way do I mean to detract from the dedication and sacrifice of our astronauts. I only ask that the same concern be shown other human beings who also give of themselves in the occupations they pursue. And we, as union members, as workers, as union representatives, as part of the general public, must demand the same kind of concern and precautions for workers in the plants as for astronauts in their space capsules.

There is still another example of what I mean by relative concern over industrial safety. Many Americans are greatly aroused over Vietnam and the deaths that result from our involvement there. But—as Secretary of Labor Shultz told the recent AFL–CIO convention in Atlantic City last month—how many people know that in the last eight years more Americans have been killed at their workplace than in Vietnam?

Again, I do not mean to detract from the sacrifices of our fighting men in Vietnam.

I cite the contrasting figures to demonstrate the lack of equal concern by many Americans over the sacrifices of workers in their jobs on the home front.

I am sure most of you are familiar with the vast difference between worktime lost through strikes and time lost through industrial accidents. But for the benefit of those who don't—let me again review them. In 1967, 42.1 million man-days were lost due to strikes but 245 million man-days were lost as a result of occupational injuries. In short, six times as much time was lost because of injury as was lost because of strikes.

The statistics on industrial safety and health are truly shocking—14,800 workers killed last year in accidents–2,200,000 disabilities suffered—$1½ billion lost in wages —$7.3 billion lost in gross national product.

In more specific terms consider the following toll that is exacted upon American workers: Of the 6,000 men who have been uranium miners, an estimated 600 to 1,100 will die of lung cancer within the next 20 years because of radiation exposure on the job.

More than 3,000 cases of silicosis are reported every year from exposure to free silica. One out of every four or five asbestos workers in New York City dies of lung cancer caused by the inhalation of asbestos fibers.

Yes, industrial disease poses a threat just as great, if not greater, than industrial accidents. It is estimated that every 20 seconds a new and potentially deadly toxic agent is introduced in industry. A recent study involving 3,200 workers in 231 foundries reveals that one in 15 of such workers was exposed to environmental conditions capable of producing disabling and fatal diseases. Some chromium compounds, widely used in metal working and plating, are suspected cancer agents.

So one can easily see that the present toll, and possible toll—when you include the silent killers, the gases, the fumes, etc.—is a costly one and potentially more costly.

Let me demonstrate this toll in relation to the time that is devoted to this conference here today and tomorrow.

This is a two-day conference. During this two-day conference 110 workers in the United States will die from on-the-job accidents, or work-related diseases. During these two days 54,400 workers will suffer injuries on the job. And during the two days of this conference, 17,000 will suffer disabling injuries or work-related diseases.

But these are cold statistics which convey some of the seriousness of the safety problem but do not reflect the cost of industrial accidents in human terms. You cannot put a price tag on human life, or human suffering, the mental anguish which results, the plans and hopes which have to be scrapped and forgotten. These are the real costs of accidents—not the man hours of time lost but the men lost; not the loss in gross national product but the loss of life and limb; not the money lost in wages but the permanent loss of a limb or the permanent loss of a faculty.

And yet, despite the losses—in time and money and human suffering—the struggle for effective legislation and enforcement is an uphill struggle. There has been a failure at all levels of government to provide effective safety and health standards but State governments have been the worst violators. With a bare handful of exceptions, states have failed to provide even the most primitive standards to protect workers. The Federal government isn't much better. Consider these facts: There are only 1,600 safety inspectors of any kind, State or Federal, in the entire United States; four states have no inspection personnel whatsoever; only three states have inspectors who are trained in the field of occupational health and industrial hygiene. You know, the ironic thing is that there are twice as many fish and game wardens in the United States as there are safety and health inspectors.

Why is there this great absence of effective legislation and enforcement? To put it simply and bluntly: Because legislators at all levels of government have been more concerned with the profit motive than the human motive.

State legislatures generally have been notorious in catering to special interests and Congress hasn't been much better. Under the Walsh-Healey Public Contracts Act, the U.S. Bureau of Labor Standards is charged with inspecting companies that have government contracts. But because Congress limits funds for such activities, the Bureau inspects less than 3% of the covered plants each year. I remind you that Congress didn't get too concerned about mine safety until 78 miners were killed in the mine disaster at Farmington, West Virginia. And an effective national mine health and safety act is still not a certainty as we meet here today.

The disgusting truth has been that industry's arguments against the costs of effective safety and health equipment have outweighed arguments that cost should not be the primary consideration.

Whenever a case is made for effective health and safety legislation business groups cut loose with a barrage of misleading propaganda. And when you strip away all the baloney—all the propaganda—the single, solitary reason for their opposition is that it will cost industry money.

How can anyone talk about costs when it comes to saving human life and limb? I say that no matter what it costs in dollars and cents, it must be done. I say that it's about time our Congress and our States tell industry to stop crying about costs and to do what must be done about safety and health.

While we can, with justification, point a finger of blame at our lawmakers, some of the blame lies with ourselves. We have not been as active or effective in political action as we can or should be. We have not elected enough of the right kind of people as often as we should. And when we have elected enough of the right kind of people, we have failed to receive a good enough return for our efforts.

The question now is, however, where do we go from here?

First, we start within our own Union, and we already have taken some significant steps. Your International Executive Board has established a permanent standing Committee on Safety and Health. We have reorganized and strengthened our Department of Safety and Health. We asked our districts to name Safety Coordinators, and we already have had a meeting of such coordinators in Pittsburgh. A comprehensive safety and health program has been drawn up by Director Schremp's Department for strengthening health and safety practices at the local union level. The holding of this conference, during which the new program will be discussed, is another example of added emphasis upon safety and health by our Union. One of the major features of the new program, for example, is the emphasis upon the importance of writing strong safety and health provisions in our collective bargaining agreements.

I want to say a few words about utilizing the collective bargaining process to incorporate safety and health provisions in our contracts. In my remarks to the Industrial Union Department's recent convention in Atlantic City, I urged the labor movement to establish a four-day workweek by 1973. I said that we should put a four-day workweek at the top of the list of our legislative and bargaining objectives. We can obtain that objective by amending the Fair Labor Standards Act so that a 32-hour workweek can be made uniform through Federal action. Or we can reach that goal in collective bargaining. In urging unions affiliated with the IUD to work for the four-day week, I cited a number of reasons for doing so. One of the reasons we are advocating a shorter workweek is to reduce the hazards to the health of workers caused by long hours on the job.

It is a proven fact that after a certain age, production workers find it quite difficult to keep up with the iron horse. They become not only physically but also mentally tired.

Such wearing down of a worker's health eventually slows his reflexes which are his first line of defense against accidental injury. Thus, fatigue becomes another factor to consider in promoting safer and healthier working conditions. A reduction in the workweek, without a cut in pay, would do much to keep workers mentally and physically alert and thus help eliminate accident and health hazards.

Given another day each week free from their jobs, workers would have more leisure time with their families and friends for living and relaxing. They could give more adequate consideration to public issues. They would be in a better position to perform their duties as parents more competently, in such matters as their children's education—or as citizens.

The first great cries from the opponents of a four-day week have already been heard. They are spreading scare stories, alleging that this would be inflationary and that a shorter workweek would cripple the economy.

Such arguments are hogwash and I cite an article in the *Wall Street Journal*, an ad, if you please, calling a conference in the City of New York by 200 of our top leading industrialists and financiers, to there give consideration to the need now to institute shorter hours of work because of the tremendous changes that are taking place in our economy and our American industry. Government data on increases in profits, dividends and real earnings provide enough evidence to prove such arguments are hogwash. Between 1960 and the first half of this year, the net profits of corporations skyrocketed 94.5%; dividend payments to stockholders soared 80%; but the weekly, after-tax take-home pay of the average non-supervisory worker increased only 35%, and in terms of buying power, only 10%. In brief, industry can well afford the four-day week. In fact, it would benefit industry in a number of ways. Productivity among workers on a short workweek would increase because there would be less time lost, less work would be spoiled due to fatigue and monotony on the job, there would be lower labor turnover and the quality of products would improve. So, all in all, it would benefit workers by reducing

fatigue on the job and thus reduce accidents; and it would benefit industry in the ways I have just enumerated.

Now, beyond our obligations to incorporate safety and health protection in our contracts, and to beef up our program on safety and health within our Union, we also have an obligation to fight for adequate legislation.

And we have some fighting to do right now—the minute this conference ends. I'm talking about the fight we're making in Congress for passage of the kind of legislation which will provide us with one giant step forward for the health and safety of workers. Before Congress right now is the Williams-O'Hara Occupational Safety and Health bill. It was introduced in the Senate by Senator Williams of New Jersey and in the House by Congressman O'Hara of Michigan. The bill would authorize the Secretary of Labor to set standards to assure safe and healthful working conditions. It would establish an enforcement procedure with specified penalties for violations of the standards, and would provide for badly-needed research, training, and a uniform reporting procedure. It also would assist the states in better enforcement, the gathering of information, and training. This is the bill that organized labor supports. This is the bill that we want and must have if the job is to be done.

Last month, in my capacity as President of IUD, I testified in Washington on behalf of this bill before the Subcommittee on Labor of the House Education and Labor Committee. I attempted to convey to the Subcommittee the sense of urgency that organized labor has about such legislation, and the great importance that we attach to it. I also told them what my views were on the bill proposed by the Nixon Administration. The Administration bill is a weak bill and would not do the job, which should not come entirely as a shock to anyone in this room. It would not cover all places in employment. It would set up a Board to develop standards but the bill would bind the Board to adopt standards developed by industry-oriented organizations. And it

would strip the Secretary of Labor of any effective enforcement power. Additionally, it would not go into effect until two years after it was signed into law.

But testifying for a bill is not enough. It helps but it takes more than talk before a Congressional Subcommittee. It takes talk from members of organized labor. It takes letters from labor. It takes visits and delegations from labor. And if need be, it takes some informational picketing and a little hell raising. It seems to me that generation of support for the Williams-O'Hara bill should be your first order of business after you leave this conference. If we are to get the legislation we need, we have got to make our desires known to Congress; we have to get through to our Senators and Representatives—just as we have been trying to get through to them on the need for genuine tax reform. In short, we have got to generate some heat. There is no reason why every local union of the Steelworkers cannot communicate, by resolution or letter, their support of the Williams-O'Hara bill to their Senators and Congressmen. If every delegate to this conference could make it the business of his local to produce 10 letters, or post cards, or telegrams from members of his local, that would mean thousands of communications hitting the offices of our Representatives in Washington.

This is what it takes. You know it as well as anyone. It cannot be done with speeches, or mirrors. It takes the same kind of fundamental political action that we try to practice at all levels of our Union. I feel certain that Director Schremp, his Department, his two associates, and the Safety Coordinators will follow through on the development of the kind of support we need—and need quickly—to get the Williams-O'Hara bill enacted into law. If your local can send a delegation to Washington to talk to your Senators and Congressman, fine. If it can't do it, it certainly can see that a delegation visits the Congressman or Senators when they are back in their home districts and states.

As I said at the beginning of my remarks, I am here today because I believe safety and health are priorities for our Union. I am here because I want to communicate this belief to you and to ask your help in providing our members with the safest and healthiest work conditions that are possible.

I am also hopeful that out of our new Department, under Director Schremp, with Marco and Adolph at his hand, and through the assistance of the Safety and Health Coordinators, through the help of all of you and your local unions, will come an aggressive membership education program. I say this about membership involvement because the job that we must do cannot be done by our new Safety and Health Department alone. It cannot be done by the Coordinators alone. It cannot be done by our staff representatives alone. It will take the concern and involvement of all of us.

I know that Director Schremp has a full agenda for this conference and that you are going to hear some stimulating suggestions from other speakers. So I will conclude my remarks by expressing my appreciation for this opportunity to be with you today, and be a part of what I consider a most important conference, conveying to you the importance that your international officers attach to our hopes and plans in the field of safety and health in the months and years to come.

Thank you and best wishes for a most successful conference.

SHEPARD, Justice, dissenting.

I concur in Part I of the majority opinion wherein it affirms the trial court's issuance of summary judgment relating to the fraud claim. I also concur in Part III of the majority opinion wherein it holds that the instant action is not preempted by federal law. I dissent from Part II of the majority opinion wherein it reverses the trial court's issuance of summary judgment on the negligence claim.

Less than two years ago this Court, with only Bistline, J. dissenting, affirmed a summary judgment granted to the United Steelworkers of America as defendant in an identical case. In *Carroll*, plaintiff was a mine worker in the same mining district as that in the instant case. In *Carroll* the same collective bargaining agreement existed between the same union and a company employer. Carroll was injured while working in the mine. Carroll was a member and brought action against the United Steel Workers of America. In *Carroll*, as here, it was asserted that the union owed a duty to Carroll since Carroll was the third-party beneficiary of the contract between the union and the employer.

I find the facts and the holding of *Carroll* indistinguishable from the present case. In *Carroll* the Court stated:

"Under Idaho law it is settled that an alleged failure to perform a contractual obligation is not actionable in tort.... Mere nonfeasance, even if it amounts to a willful neglect to perform the contract, is insufficient to establish a duty in tort.... Consequently, Carroll's cause of action, if any, arising from the Collective Bargaining Agreement lies only in contract, not in tort."

In support of that holding, the *Carroll* Court discussed *House v. Mine Safety Appliances Company*, 417 F.Supp. 939 (1976), stating:

"Judge Anderson, in dicta, discussed public policy considerations which relate to the issue of imposing tort liability on the basis of a collective bargaining agreement.... To impose liability on the union in a case such as this is against public policy and would seriously disrupt labor relations policy."

Bistline, J. dissented in *Carroll*, and his position in the instant case is consistent. I cannot, however, fathom the reasoning of the two members of the Court. If *Carroll* was wrong, it should be overruled. I view as sophistry any attempt to distinguish *Carroll* on the basis that *Carroll* involved a total failure of duty, while the instant case involves only a partial failure of duty. If such be a distinction, it is merely one without a difference.

Lastly, it is to be noted that the defendant United Steelworkers of America, is an unincorporated association. Plaintiff is a member of that unincorporated association. Presumably the union has no existence, corporate or otherwise, separate and apart from its members, and does not constitute a separate entity. The question of how the plaintiff, along with others as members of a nonincorporated association, can owe a duty to himself is not discussed, nor the implications of a breach of that duty which presumably plaintiff, along with others, had an alleged obligation to perform.

BAKES, Justice, dissenting:

For the reasons set out below, I would affirm the decision of the district court granting summary judgment in favor of the respondent United Steelworkers of America.

I

I believe that this action is preempted by federal law. When this case was before this Court previously in *Dunbar et al. v. United Steelworkers of America et al.*, 100 Idaho 523, 602 P.2d 21 (1979), I then wrote that the preemption issue should not be decided on a motion to dismiss, as had been in that case, but that it should "await a full factual development of the legal issues raised under our state tort law." After the Court in *Dunbar* remanded the case to the district court for further proceedings, extensive discovery was conducted, resulting in a more complete factual evaluation of the plaintiffs' claims. Also, in the interim the United States Supreme Court had again spoken, I believe definitively, in the case of *Allis Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). Based upon that record, I now believe that federal law requires us to affirm the decision of the district court.

In *Allis Chalmers Corp. v. Lueck, supra,* the Supreme Court determined that Section 301(a) of the Labor Management Relations Act of 1947, 27 U.S.C. § 185(a), requires state courts to apply federal law when resolving a state tort claim which is substantially dependent upon analysis of the terms of the collective bargaining agreement. In order to understand the Court's decision in *Allis Chalmers*, it is necessary to understand Section 301(a) of the Labor Management Relations Act of 1947.

Section 301(a) states:

"Suits for violation of contracts between an employer and the labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a).

Although on its face Section 301(a) simply gives the federal district courts jurisdiction over suits for violation of certain specified types of contracts, the statute's import has been extensively analyzed by the United States Supreme Court. In *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 783 (1962), the Court recognized that in enacting Section 301(a) Congress intended that both state and federal courts have concurrent jurisdiction over contracts made by labor organizations. In exercising this concurrent jurisdiction, the federal courts are authorized to fashion a body of federal law for the enforcement of such agreements. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). The application of state law is preempted because uniformity in this area of the law is particularly important since,

"The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the con-

tract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation. Indeed, the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes." *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103–04, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962) (footnote omitted).

Thus, "[i]n enacting Section 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Teamsters v. Lucas Flour,* 369 U.S. at 104, 82 S.Ct. at 577, 7 L.Ed.2d 593 (1962).

Section 301 preemption, which gives the state concurrent jurisdiction but mandates that the state courts apply federal substantive law, is distinct from the sort of preemption discussed in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and its progeny. *Garmon* preemption is concerned with protecting the primary jurisdiction of the National Labor Relations Board. *San Diego Building Trades Council v. Garmon, supra.* See also *Allis Chalmers Corp. v. Lueck,* 471 U.S. 202, 213–14, 105 S.Ct. 1904, 1912–13, n. 9, 85 L.Ed.2d 206 (1985); *Brown v. Hotel & Restaurant Employees & Bartenders,* 468 U.S. 491, 502–503, 104 S.Ct. 3179, 3186 (1985). Section 301 preemption does not stem from concern for the National Labor Relations Board's primary jurisdiction. Rather, Section 301 preemption reflects Congress's concern that collective bargaining agreements be interpreted under a uniform federal labor law.

Stressing this need for uniformity, the Court in the recent *Allis Chalmers* decision extended the preemptive effect of Section 301 beyond suits merely alleging contract violations. The court stated:

"Questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, *whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.* Any other result would elevate form over substance and allow parties to evade the requirements of Section 301 by relabeling their contract claims as claims for tortious breach of contract." *Allis Chalmers v. Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911. (Emphasis added.)

The Court's extension of Section 301 is not surprising given the close relationship between contract actions and tort actions arising out of contract. *See generally* Prosser & Keeton, The Law of Torts, §§ 92, 93 (1984).

In determining whether Section 301(a) applies to a tort claim, the focus is on "whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract. If the state's tort law purports to define the meaning of the contract relationship, that law is preempted." *Allis Chalmers v. Lueck,* 471 U.S. at 213, 105 S.Ct. at 1912. The characterization of an action as a tort action is not sufficient to avoid preemption under Section 301(a).

Application of the preemption test articulated in *Allis Chalmers* to the facts of the wrongful death action now before this Court is complicated by limiting language [1]

---

1. In *Allis Chalmers v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Court noted: "It is perhaps worth emphasizing the narrow focus of the conclusion we reach today. We pass no judgment on whether the suit also would have been preempted by other federal laws governing employment or benefit plans. Nor do we hold that every state lawsuit asserting a right that relates in some way to a provision in a collective bargaining agreement, or more generally to the parties to such an agree-

ment, necessarily is preempted by Section 301. The full scope of the preemptive effect of federal labor contract law remains to be fleshed out on a case by case basis. We do hold that when resolution of a state law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a Section 301 claim, *see Avco Corp. v. Aero Lodge 735,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126

in *Allis Chalmers.* However, considering the specific facts set forth in *Allis Chalmers,* I can find no basis for distinguishing *Allis Chalmers* from the case at bar.

In *Allis Chalmers,* the Wisconsin Supreme Court had determined that the plaintiff's action for bad faith handling of an insurance claim, arising from a claim made under a disability plan included in a collective bargaining agreement, was not preempted. The Wisconsin court's conclusion was based upon application of the balancing test enunciated in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 245, 79 S.Ct. 773, 779 (1959). Using the *Garmon* analysis, the Wisconsin court held that the administration of disability claim procedures under collective bargaining agreements was only of peripheral concern to federal labor law, but that the bad faith insurance tort was of substantial significance to the State of Wisconsin. This analysis was rejected by the Supreme Court. The Court stated:

> "So called *Garmon* preemption involves protecting the primary jurisdiction of the NLRB, and requires a balancing of state and federal interests. The present tort suit would allow the state to provide a rule of decision where Congress has mandated that federal law should govern. In this situation, the balancing of state and federal interests required by *Garmon* preemption is irrelevant, since Congress, acting within its power under the commerce clause, has provided that federal law must prevail." *Allis Chalmers v. Lueck,* 471 U.S. 214, n. 9, 105 S.Ct. 1913 n. 9.

The *Garmon*-type analysis is simply not applicable if the asserted claim is "inextricably intertwined with consideration of the terms of the labor contract." If the asserted claim is "inextricably intertwined with consideration of the terms of the labor contract," Section 301 mandates that federal substantive law be applied.

In our prior decision in *Dunbar v. United Steelworkers of America,* 100 Idaho 523, 602 P.2d 21 (1979), which was decided

(1968), or dismissed as preempted by federal

prior to *Allis Chalmers,* the Court addressed only the question of whether this action is preempted because it would infringe upon the primary jurisdiction of the National Labor Relations Board. The Court today continues to adhere to the views expressed in *Dunbar* insofar as the *Garmon* preemption analysis may be applied to claims unrelated to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from that agreement. However, in *Dunbar* we did not consider whether the Section 301 preemption of *Allis Chalmers,* which requires that our state courts apply uniform federal law, applies in this wrongful death action. If this wrongful death action is "inextricably intertwined with consideration of the terms of the labor contract," as was the bad faith tort alleged in *Allis Chalmers,* we must apply federal substantive law as mandated by Section 301(a).

Having fully considered the record, I conclude that Section 301(a) applies here. Any duty which the union owed to its members, and which might form the basis of the plaintiffs' negligence claims, arose through the terms of the collective bargaining agreement. It was the collective bargaining agreement which provided for the formation and membership of the Safety Committee and set forth the duties of the Safety Committee. Whether the terms of the collective bargaining agreement imposed a duty on the union or merely gave the union the right to participate in the selection of the safety committee is a question "inextricably intertwined with consideration of the terms of the labor contract."

The majority's attempt to characterize the duty that the union owed to its members as arising from the union's constitution and the actions of the union's officers toward its members are unpersuasive. Through the negotiation process, the union and the company worked out the collective bargaining agreement which not only outlined the union's responsibilities in regard

labor contract law."

to the Safety Committee, but also limited the union's right to interfere in the operation of the mine. Any duty which the union had to its members to preserve safe conditions within the mine could only be fulfilled through the terms of the collective bargaining agreement. Thus, because consideration of issues related to the union's duty is inextricably intertwined with consideration of the collective bargaining agreement, we cannot ignore the Supreme Court's mandate. The plaintiffs' negligence claim must be treated as a Section 301 claim, and federal law applied.

A survey of federal law indicates that the only duty which the union owes to its members under federal law is the duty of fair representation.[2] The duty of fair representation is breached only when the conduct of the union is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Due care has not been incorporated into the union's duty of fair representation. Mere negligence does not generally constitute a breach of the union's duty of fair representation. *Condon v. Local 2944, United Steelworkers*, 683 F.2d 590 (1st Cir.1982). *Dente v. International Organization of Masters, Mates & Pilots, Local 90*, 492 F.2d 10 (9th Cir.1973). Since the plaintiffs here have not alleged that the union's conduct was arbitrary, discriminatory, or in bad faith, the appellants have not made out a cause of action. Accordingly, the district court was correct in granting the union's motion for summary judgment with respect to the negligence issues.[3]

## II

Even if state tort law, rather than federal law, applied, the majority's analysis of the negligence issues under state tort law and its effort to distinguish our recent case of *Carroll v. United Steelworkers of America*, 107 Idaho 717, 692 P.2d 361 (1984), is difficult to comprehend. That case involved a substantially similar contract and substantially similar facts. The majority attempts to distinguish this case from *Carroll* stating that in *Carroll* the safety committee failed to perform protective actions, but that

> "in the instant case, by contrast, the safety committee did inspect the mine and the miners allege *not* that the Union members of the safety committee failed to inspect but that they actually performed the duty of inspection in a negligent manner and failed to report what should have been obvious safety problems, the duty to report necessarily flowing from the act of inspection. Hence, the instant case does not present a situation of non-feasance but one of malfeasance." Ante at 636, 726 P.2d at 748.

Without stating it, the majority is applying a *respondeat superior* doctrine to the union for the alleged malfeasance of a safety committee, only some members of which they had the responsibility of appointing. The majority has failed to recognize that the union, and the safety committee which failed to inspect or inspected in a negligent manner, are not one and the same. Rather, under the collective bargaining agreement, as the majority points out, the union was to appoint three members of the safety committee, and management was to appoint three members of the committee. For all that this record shows, the union did perform its contractual obligation and

**2.** In *Carroll v. United Steelworkers of America*, 107 Idaho 717, 692 P.2d 361 (1984), we recognized that other duties may arise under state law. Quoting from *Dunbar v. United Steelworkers of America*, 100 Idaho 523, 602 P.2d 21 (1979), we reiterated the view that there is

"no authority ... which insulates a union for its negligence and tortious conduct toward one of its members, *i.e.,* if a member of a union was struck by a motor vehicle owned by the union and operated by one of its officials during the course of his employment

with the union, we cannot believe the union would be insulated from liability on the basis that the only duty it owed toward its members was that of fair representation."

**3.** Where an order of a lower court is correct, albeit based on a different theory than that found to be dispositive by the Supreme Court, the lower court order will be affirmed. *Sheppard v. Sheppard*, 104 Idaho 1, 7, 655 P.2d 895, 901 (1982).

did appoint its members to the safety committee, as did management. However, the safety committee was not the *alter ego* of the union, nor is there anything in the record from which a triable issue of fact arises concerning whether or not the union had a right to direct the manner in which the safety committee carried out its inspections. The majority opinion merely assumes that any negligence of the safety committee, which was composed of both management and union designees, was, perforce, misconduct of the union and thus actionable. The majority assumes *respondeat superior* liability on behalf of the union for an organization which the record does not reflect it had any authority to control. This is clearly reflected in its opinion, *ante* at 750, when it states, "In light of the above record, we cannot conclude as a matter of law that the Union owed no duty to exercise due care in performance of the inspections once its personnel undertook them." However, those personnel were members of a committee composed of both management and labor representatives. The majority does not even discuss, much less support in the record and by authorities, the proposition that the union, which appointed representatives to the safety committee pursuant to provisions of the collective bargaining agreement, would then be responsible if one of its appointees did not exercise due care in performing the safety committee's inspection function. The appellants have not pointed out any such facts or law to support *respondeat superior* liability under those circumstances and, accordingly, the district court's judgment should be affirmed on that issue.

Furthermore, the majority opinion states, *ante* at 750, "Moreover, we cannot conclude as a matter of law that the Union owed no duty to bring to the attention of the members of the safety committee the safety problems that existed in the Sunshine Mine." However, there is nothing in the record to suggest that, apart from the knowledge gained by those appointees to the safety committee who may have conducted inspections, the "union" ever had any knowledge of safety problems that existed in the Sunshine Mine.

Finally, the majority states, *ante*, at 750, that "[b]ecause the Union, pursuant to the provisions of the collective bargaining agreement, had contracted to inspect and, in fact inspected the mine, it owed the (minimal) duty to its members to exercise due care in inspecting and in reporting the findings of its inspection." Again, the collective bargaining agreement did not impose upon the union a duty to inspect the mine, but merely to appoint representatives to the safety committee who, along with the management representatives, would inspect the mine. The union carried out its responsibility under the collective bargaining agreement by appointing the members. However, assuming that the appointees negligently carried out their responsibilities, there is no showing in fact or law that the union is responsible for their conduct under a *respondeat superior* theory. The majority is plainly incorrect when it concludes that, under the provisions of the collective bargaining agreement, the union "had contracted to inspect and, in fact inspected the mine...." Accordingly, I believe the summary judgment granted by trial court should be affirmed.